NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

G & T TERMINAL PACKAGING CO., INC., Mr. Sprout, Inc., Chain Trucking, Inc., Tray Wrap, Inc., and Slow Pack, Inc., Respondents.

No. 00–4095.

United States Court of Appeals,
Second Circuit.

Argued Dec. 6, 2000.

Decided March 14, 2001.

David A. Fleischer, Senior Attorney (Leonard R. Page, General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel), National Labor Relations Board, Washington, DC, for Petitioner.

Linda Strumpf, New York, NY, for Respondents.

Before NEWMAN, CABRANES, and STRAUB, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

Before us is a petition of the National Labor Relations Board (the "NLRB" or the "Board") for enforcement of an August 20, 1998 order (the "Order") adopting, with modifications, the findings, conclusions, and recommended order of Administrative Law Judge ("ALJ") Raymond P. Green. *See G & T Terminal Packaging Co., Inc.,* 326 N.L.R.B. 114, 118 (1998) (appending ALJ Green's recommended order).[1] The Board concluded that respondents G & T Terminal Packaging Co, Inc. ("G & T"); Mr. Sprout, Inc.; Chain Trucking, Inc.; Tray Wrap, Inc.; and Slow Pack, Inc. (collectively, the "Company" or "respondent") violated Section 8(a)(1), (3), and (5) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1), (3), and(5),[2] by committing unfair labor practices against the union that represents respondent's employees, Paper Products and Miscellaneous Drivers, Warehousemen, Helpers and Messengers, Local 27, International Brotherhood of Teamsters, AFL–CIO, which on December 1, 1995 merged into Private Sanitation Union Local 813, International Brotherhood of Teamsters a/w AFL–CIO (the "Union"). *See G & T,* 326 N.L.R.B. at 114. These unfair labor practices include: failing to sign a collective bargaining agreement ("CBA"); discharging or laying off and refusing to rehire employees because of their union membership and activities; unilaterally subcontracting certain operations; unilaterally reinstating employees without regard to seniority; and unilaterally granting wage increases to some employees. *See id.* The Board issued a broad cease and desist order and

1. The ALJ's recommended order, adopted as modified by the Board, consists of two parts. First, the Company is ordered to "[c]ease and desist from" engaging in certain activities in violation of the Act. *G & T,* 326 N.L.R.B. at 126. Second, the Company is ordered to "[t]ake ... affirmative action necessary to effectuate the policies of the Act." *Id.* We use "Order" to refer to the Board's decision as a whole, "cease and desist order" to refer to the first part of the recommended order, and "affirmative remedies" to refer to the second.

2. In relevant part, 29 U.S.C. § 158(a)(1), (3), and (5) provides:

(a) Unfair labor practices by employer
It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
. . .
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ...;
. . .
(5) to refuse to bargain collectively with the representatives of his employees....

imposed affirmative remedies on the Company, including requirements that it: reinstate respondent's unilaterally subcontracted potato-packaging operation; rehire the 22 employees who had been employed in that operation; and pay 18 percent annual interest on moneys owed to the Union's pension and welfare funds. *See id.* at 117 (affirming the ALJ's recommended order with modifications); *see also id.* at 126 (setting forth the ALJ's recommended order).[3]

For the reasons set forth below, we grant the Board's petition for enforcement, except that (1) insofar as the Order requires respondent to reinstate its potato-packaging operation and to rehire the 22 employees who used to operate the potato-packaging machine, we deny enforcement and remand the cause to the Board with instructions to arrive at a remedy that will effectuate the general reparative policies of the Act by making the employees whole without imposing an undue burden on the employer; (2) insofar as the order requires respondent to pay specific amounts to the pension and welfare funds, we remand the cause to the Board for re-calculation of these amounts consistent with this opinion; and (3) insofar as the Order requires respondent to pay 18 percent interest on the amounts owed to the pension and welfare funds, we remand the cause to the Board for further development of the *record* consistent with this opinion.

## I.

The facts in this case are set forth in detail in ALJ Green's recommended order,

with which we assume familiarity. *See id.* at 119–24. Below, we summarize the facts relevant to this appeal.

The Company is engaged in vegetable-packing operations at the Hunts Point Terminal Produce Market (the "Hunts Point market") in the Bronx, New York, buying primarily tomatoes, Brussels sprouts, and potatoes in bulk, repackaging them in smaller units, and reselling them to grocers and supermarkets. *See id.* at 119. The Company has had a collective bargaining relationship with the Union for approximately fifteen years, both while the Company was located at 230th Street in the Bronx, and after the Company moved to the Hunts Point market location. *See id.* A contract for the years 1989–1992 between the Company and the Union (the "expired CBA") was in effect until September 30, 1992. In 1992 and 1993, the Company and the Union engaged in unsuccessful negotiations for a new CBA. *See id.*

At some point in 1992, the Union was put into trusteeship by the International Brotherhood of Teamsters, and a business agent by the name of Richard Ruggiero took over the role of Union representative. *See id.* On October 29, 1992, at a meeting between Ruggiero and Company President Anthony Spinale, the latter declared that he did not recognize the Union and refused to bargain on a new CBA. *See id.* However, negotiations continued, with the Company's general counsel, Linda Strumpf, representing Spinale in all subsequent meetings. *See id.* at 120–23.[4] By Novem-

---

**3.** In an earlier proceeding between the same parties, we granted enforcement of an NLRB order adopting the decision of ALJ D. Barry Morris, who concluded that the Company violated Section 8(a)(1) and (5) of the Act by unilaterally discontinuing contributions to the Union's welfare and pension funds, and recommended that the Company be ordered to resume such contributions and make bargain-

ing unit employees whole for any loss of benefits suffered as a result of the discontinuation of the contributions. *See NLRB v. G & T Terminal Packaging Co., Inc.,* No. 94–4150 (2d Cir. Sept. 20, 1994) (unpublished order).

**4.** Due to her role in the negotiations, Linda Strumpf was respondent's sole witness in the proceedings before the ALJ with regard to a

ber 5, 1993, the parties had reached an agreement on all terms of a new CBA except the arbitration clause,[5] which the Company wished to delete. *See id.* at 120.[6]

On June 10, 1994, Strumpf and Ruggiero met again. *See id.* In the proceedings before the ALJ, the parties' recollection of what took place in this meeting differed. *See id.* Ruggiero testified that Strumpf repeated the Company's desire to delete the arbitration clause but assured him that she was there to sign a contract. *See id.* According to Ruggiero, he responded that

he would agree to the deletion if the Company would agree to delete the "no-strike, no-lockout" clause.[7] Ruggiero explained that Strumpf agreed to this trade-off, telling him that Spinale would sign the contract and that she would fax it to the Union as soon as possible. *See id.* In addition, Ruggiero testified that he requested a list of then-current job classifications and wages and asked that the Company pay back dues and moneys owed to the pension and welfare funds, but that he did not make acceptance of the agreement contingent on these payments. *See id.*

critical issue on appeal, which the panel believed might raise conflict-of-interest concerns. We therefore issued an order on November 30, 2000, requiring respondent either to file an appearance by a new attorney who could argue the appeal or to submit an affidavit stating that Strumpf's disqualification "would work a substantial hardship on the client because of the distinctive value of the lawyer or [her] firm as counsel in this particular appeal." ABA Code of Professional Responsibility, Disciplinary Rule 5–101(B)(4). On December 4, Spinale timely submitted the suggested affidavit. Accordingly, we permitted Strumpf to argue the appeal.

5. The arbitration clause in the expired CBA requires the parties to attempt to resolve any dispute concerning the agreement "within twenty-four (24) hours, or within such additional period of time as the parties mutually stipulate," and if they fail to reach a resolution, to submit the dispute to the New York State Board of Mediation and Arbitration. Expired CBA at ¶ 12(a).

6. In the prior proceeding, *see ante* at note 3, we affirmed ALJ Morris's finding that the parties had reached an agreement on all terms except the arbitration clause by November 5, 1993. *See G & T,* 326 N.L.R.B. at 115 n. 6; *see also id.* at 118.

7. In relevant part, the "no strike/no lockout" provision in the expired CBA states:

(a) Except for the Employer's failure to comply with [certain provisions of the CBA] ... or ... with an Arbitrator's Award ... or ... with the outcome of a final appeal [of

such award], in any of which instances the Union may deem the Employer's action a breach of contract, the Union will not call or permit, directly or indirectly, any strike or work stoppage against the Employer. (b) Where an unauthorized strike or work stoppage occurs, the Union will make immediate efforts to return the strikers to their respective jobs and the Union will immediately, if possible, notify the Employer in writing that the strike or work stoppage, is unauthorized.... (c) Except for the Union's failure to comply with an Arbitrator's Award, or if such an Award is appealed, then failure to comply with the outcome of a final appeal, the Employer will not engage in any lockout. Expired CBA at ¶ 11(a)-(c). Both arbitration and no strike/no lockout clauses are intended to "promot[e] industrial peace." *International Ass'n of Machinists and Aerospace Workers v. General Elec. Co.,* 865 F.2d 902, 903 (7th Cir.1989) (citing GORMAN, BASIC TEXT ON LABOR LAW: UNIONIZATION AND COLLECTIVE BARGAINING 605–06 (1976)). As the Supreme Court has explained, "[p]lainly the agreement to arbitrate grievance disputes is the quid pro quo for an agreement not to strike." *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 455, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *see also Boys Mkts. Inc. v. Retail Clerks Union,* 398 U.S. 235, 247–48, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) ("'[A] no-strike obligation, express or implied, is the quid pro quo for an undertaking by the employer to submit grievance disputes to the process of arbitration."); *Local 74, Serv. Employees Int'l Union v. Ecclesiastical Maint. Servs., Inc.,* 55 F.3d 105, 109 (2d Cir.1995).

Strumpf, in turn, testified that she was not authorized to sign a contract, and that she told Ruggiero that she would have to check with Spinale on the issue of the "no-strike, no-lockout" clause and get back to Ruggiero. *See id.*

It is undisputed that Strumpf did not fax a signed contract to the Union, although Ruggiero called her to inquire about it several times in August 1994; according to the ALJ, "[Strumpf] admits that she procrastinated." *Id.* On August 16, Strumpf faxed a version of the contract to Ruggiero with the arbitration and "no-strike, no-lockout" clauses deleted, pursuant to their understanding. *See id.* However, this new contract was missing the classification schedule Ruggiero had requested, and had not been signed. *See id.*

The same day, Strumpf faxed a copy of the same contract to Spinale with a cover letter addressed to Mazie Faracie, the owner of Tray Wrap, Inc.,[8] that read as follows:

> I am enclosing two copies of the proposed Union contract for Tony to sign. I prepared it. I am also enclosing the list of payments the union says [are] due for pension and welfare. They agreed to take payments. Tell me how many you need.
>
> Also, they want us to deduct back dues owed from the employees. They want us to take 3—1 each month to catch up.

Finally, *if Tony wants to sign contract and return to me; that is OKAY.* Meanwhile, I will try to get up there Wednesday or Friday early.

*Id.* at 120. (emphasis added).

■ Ruggiero filed an unfair labor practice charge against the Company on August 24, 1994, alleging that the Company had refused to sign the agreement reached on June 10, 1994. *See id.* at 121. The Board's General Counsel issued a complaint on October 7,[9] but nothing else happened until April 1995. *See id.* At that time, Commissioner Irwin Gerard of the Federal Mediation and Conciliation Service scheduled a meeting with Ruggiero and Strumpf for April 14. *See id.*[10] At that meeting, Strumpf presented Ruggiero with yet another unsigned contract document from which additional clauses were deleted, including clauses that provided Union members with two holidays. *See id.* Strumpf testified that she made these additional deletions pursuant to Spinale's request for further concessions in return for the elimination of the no-strike, no-lockout clause. *See id.* When Ruggiero objected to the additional deletions, Strumpf agreed to restore the disputed provisions, and told him she would call him again on the following Monday to set up another meeting. *See id.*

Three days later, on April 17, 1995, at 7:30 a.m., a day on which the Hunts Point

---

8. The letter was addressed to Faracie at G & T Terminal Packaging Co., Inc.

9. Under the Act, either the General Counsel or a Regional Director may issue a complaint. *See NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 126, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987) (noting "General Counsel's unreviewable discretion to file and withdraw a complaint"); 29 C.F.R. §§ 102.15, 102.19 (authorizing Regional Directors to issue complaints subject to oversight by General Counsel).

10. We noted above, *see ante* at note 4, that Strumpf was respondent's sole witness with respect to a critical issue on appeal—namely, the dispute over what happened at the June 10, 1994 meeting. Commissioner Gerard was present at this meeting as well, but the ALJ granted his motion to quash a subpoena pursuant to the longstanding agreement between the NLRB and the Federal Mediation and Conciliation Service exempting mediators from appearing before the NLRB or ALJs in order to preserve their neutrality. *See* Order Revoking Subpoena, Mar. 25, 1996.

market was closed to the public but which was a regular workday for employees, Ruggiero and two other Union business agents set up an informational picket line at the market. *See id.* at 121–22. Although they used signs indicating they were protesting unfair labor practices and which read, "On Strike, G & T Packers," they did not ask employees to strike, telling them to report to work instead. *See id.* Just before 8:00 a.m., the employees attempted to enter the premises to go to work, but Spinale told them that they were not needed anymore and that, as the ALJ summarized it, "they should go home and/or collect unemployment." *Id.*[11] About 60 employees were not permitted to work that day.[12] *See id.* at 126–27 (Appendix A).

Later in the morning on April 17, 1995, Strumpf arrived at the market and spoke to Ruggiero about the labor dispute. *See id.* at 122. She stated that the contract would be signed but that additional deletions had to be made. *See id.* A frustrated Ruggiero responded that if the Company insisted on further deletions, the Union would demand a 25-cent-per-hour raise for each year of the contract. *See id.* Strumpf replied that the Company would then simply close, to which Ruggiero responded that they should negotiate the terms of a closeout. *See id.* Strumpf then stated that the Company would reinstate 30 employees without regard to seniority, explaining that because there was no contract, there was no seniority clause. *See id.*

On the afternoon of April 17, 1995, Spinale decided to terminate his potato-packaging operation. *See id.* He immediately had the potato-packaging machine dismantled and the parts sent to M & M Produce Farms and Sales ("M & M"), a company to which G & T had previously subcontracted some of its sales. *See id.*

On April 18, Ruggiero asked Spinale to take the employees back, and Spinale reiterated that he would take back about 30 of them. *See id.* On April 19, Spinale rehired approximately this number without regard to seniority. *See id.* at 123. In addition, based on what the Company now concedes was the "possibly ill-advised" counsel of a labor lawyer who had previously represented G & T in another matter, *see* Resp. Br. at 62, Spinale created a shell corporation named Slow Pack, Inc., on April 19, and shifted his G & T employees onto that company's payroll. *See G & T*, 326 N.L.R.B. at 123. In May 1995, the Company resumed some portion of its potato-packaging operation by hand, and continued to service some of its customers through M & M.[13] *See id.* Also in May, the Company gave a raise to some of its

11. Testimony varied as to precisely what Spinale said; the words "and/or" were the ALJ's.

12. Although the ALJ found that 60 people were not permitted to return to work, the list in Appendix A of the ALJ's decision contains approximately 55 names. *See id.* at 126–27. The exact number is difficult to ascertain due to formatting errors on the document.

13. It is unclear precisely what proportion of its pre-April 17, 1995 potato sales the Company continued to make after dismantling the machine. Although the ALJ found that the Company continued to make 40 to 60 percent of its potato sales through M & M *after* the potato-packaging machine was dismantled, *see G & T*, 326 N.L.R.B. at 122, the Board interpreted this as a finding that the Company had been making 40 to 60 percent of its potato sales through subcontractors such as M & M *before* April 17, 1995, *see id.* at 116. The Board did not make a specific finding with respect to what proportion of total sales the Company continued to make *after* April 17. At oral argument counsel for the Company insisted that it has resumed only about five percent of its pre-April 17, 1995 operation. *See* Tr. of Oral Argument at 3.

female employees without notifying or bargaining with the Union. *See id.*

Adopting the ALJ's findings, conclusions, and recommended order with some modifications, the Board concluded that an agreement had indeed been reached on June 10, 1994, and that the Company had violated Section 8(a)(1) and (5) of the Act by failing to sign the document embodying this agreement; that the Company's discharge of employees and unilateral subcontracting of the potato-packaging operation on April 17, 1995 was motivated by animus against the Union and therefore violated Section 8(a)(1), (3), and (5) of the Act; that the Company had violated Section 8(a)(1) and (5) of the Act by unilaterally rehiring employees without regard to seniority and by unilaterally granting wage increases to some of them; and that Slow Pack was an alter ego of G & T and therefore bound by the June 10 agreement and liable to the same extent as G & T. *See id.* at 114–17 (adopting ALJ's findings with modifications), 119–24 (setting forth ALJ's findings). With some modifications, the Board adopted the broad cease and desist order recommended by the ALJ, and the proposed affirmative remedies. *See id.* at 117. These remedies included the "restor[ation]" of the potato-packaging operation to its size as of April 17, 1995, unless the Company can show at compliance [proceedings], on the basis of evidence that was not available at the time of the unfair labor practices hearing, that those actions would be unduly burdensome."[14] *See id.* at 126.[15] In addition, the Board adopted the ALJ's recommendation that the Company pay 1.5 percent monthly (or 18 percent annual) interest on the $58,447.20 owed to the pension fund and the $8,840 owed to the welfare fund for the period from January 1993 through February 1996, as well as for subsequent periods to be determined as appropriate. *See id.* at 114 n. 4, 124 (authorizing General Counsel to reopen the matter for periods after February 1996), 128–29 (table calculating moneys owed). The ALJ derived the 1.5 percent monthly interest rate from the underlying trust documents. *See id.* at 123–24.[16]

---

14. As we have previously explained, "[c]ompliance determinations are routinely made 'after entry of a Board order directing remedial action, or the entry of a court judgment enforcing such [an] order.' " *NLRB v. Katz's Delicatessen of Houston Street, Inc.*, 80 F.3d 755, 771 (2d Cir.1996) (quoting 29 C.F.R. § 102.52)). Compliance issues may be resolved in formal proceedings, including hearings before an ALJ. *See id.; see also* 29 C.F.R. § 102.54(a) ("If it appears that controversy exists with respect to compliance with an order of the Board which cannot be resolved without a formal proceeding, the Regional Director may issue and serve on all parties a compliance specification in the name of the Board. The specification shall contain or be accompanied by a notice of hearing before an administrative law judge at a place therein fixed and at a time not less than 21 days after the service of the specification.").

15. With respect to this remedy, the Board agreed that "a restoration remedy is appropriate" but specifically noted that it did *"not* rely on the [ALJ's] comment: 'if as Mr. Spinale says a more modern and computerized machine would be more efficient than this obsolete potato-packaging machine, then the sum of money spent to replace it would probably be a good investment, yielding future profits.' " *G & T*, 326 N.L.R.B. at 116 n. 11 (emphasis added) (quoting *id.* at 125).

16. With respect to the interest rate, the trust documents for the pension and welfare funds provide, in relevant part:

In addition to any other remedies to which the parties may be entitled, an Employer in default for not less than five working days shall be obligated to pay interest at the rate specified in the Collective Bargaining Agreement, or if a rate is not specified in the Collective Bargaining Agreement, *at a rate of not less than one and one half percent per month* on the contributions due from the date when payment was due to the date when payment is made. . . .

## II.

The Company challenges the Board's findings and conclusions, the broad cease and desist order, and the affirmative remedies almost in their entirety.[17] We review these matters in turn.

### A.

■ The Board's findings of fact "if supported by substantial evidence on the record considered as a whole shall ... be conclusive." 29 U.S.C. § 160(f); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–91, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Katz's Delicatessen*, 80 F.3d at 763. As explained by the Supreme Court, "[s]ubstantial .evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera*, 340 U.S. at 477, 71 S.Ct. 456 (internal quotation marks omitted). The "substantial evidence" standard requires us to review "the record in its entirety ..., including the body of evidence opposed to the Board's view." *Id.* at 488, 71 S.Ct. 456. However, we must respect the Board's role as an agency "equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect." *Id.* We may not "displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] de novo." *Id.* Instead, a "reversal based upon a factual question

will only be warranted if, after looking at the record as a whole, we are left with the impression that no rational trier of fact could reach the conclusion drawn by the Board." *Katz's Delicatessen*, 80 F.3d at 763 (internal quotation marks omitted). In addition, "[o]ur role in reviewing credibility determinations of an ALJ, affirmed by the Board, is even further constricted, inasmuch as they may not be disturbed unless incredible or flatly contradicted by undisputed documentary testimony." *Id.*

After reviewing the record in this case, we conclude that it contains substantial evidence in support of the ALJ's findings, which were adopted by the Board, to wit: that the parties reached an agreement on June 10, 1994, which the Company was obligated to sign; that the Company discharged and refused to rehire a group of employees on April 17, 1995 because of their union membership and activities; that the Company unilaterally subcontracted its potato-packaging operation; that the Company subsequently reinstated some of its employees without regard to seniority; and that Slow Pack, Inc., is an alter ego of G & T. Furthermore, we conclude that the Board properly determined, based on these findings, that the Company violated Section 8(a)(1), (3), and (5) of the Act.

*The June 10 agreement.*

■ Substantial evidence in the record supports the ALJ's findings that Strumpf had apparent authority to enter into an agreement on June 10, 1994, and that the parties indeed entered into an agreement on that date.

---

Second Restated Agreement and Declaration of Trust (May 2, 1994), ¶ 5 (emphasis added); *see also* Agreement and Declaration of Trust (Sept. 1, 1993), ¶ 5 (same).

**17.** Although the Company denies all liability and challenges the Board's Order as a whole, the Company does not make specific argu-

ments challenging the finding that it unilaterally granted wage increases to some of its female employees without notifying or negotiating with the Company. Therefore, we do not address this particular issue and leave this finding undisturbed.

The Company claims that Strumpf's standard practice was to check contract terms with Spinale before agreeing to them. However, the ALJ credited Ruggiero's testimony that at the June 10 meeting Strumpf stated that she was there to enter into an agreement. *See G & T*, 326 N.L.R.B. at 120. In light of Spinale's absence from these negotiations, and the fact that the parties had already—on November 5, 1993—reached an agreement as to all terms except the arbitration clause, a "rational trier of fact could reach the conclusion," *Katz's Delicatessen*, 80 F.3d at 763, that Ruggiero's testimony concerning Strumpf's claim of authority to enter into an agreement was credible. We will not disturb the ALJ's credibility determination unless the testimony is "incredible or flatly contradicted by undisputed documentary testimony," *id.*, and, on this record, we find no basis to reject the finding that Strumpf led Ruggiero to believe that she had authority to enter into an agreement on June 10, 1994.

The record also supports the finding that the parties indeed entered into the agreement at the June 10, 1994 meeting. In making the finding, the ALJ relied in part on an August 16, 1994 fax to Faracie, in which, as the ALJ characterized it, Strumpf "asks for [Spinale's] signature on the document and does not either make or ask for any comments or suggestions regarding its terms." *Id.* at 121. Although its language is somewhat ambiguous—the letter refers to a "proposed contract," not a "final contract," and concludes with the phrase "[i]f Tony wants to sign" rather than, for instance, "when Tony wants to sign"—the letter does contemplate the execution of the attached contract document without further discussion. In the circumstances presented by the record as a whole, the letter supports the ALJ's finding that the document embodied an agree-ment that had already been reached by the parties.

In addition, the ALJ relied on Strumpf's testimony to the effect that she told Ruggiero in early August 1994 that, as the ALJ paraphrased it, "Spinale wanted her to draft a contract covering *what had been agreed upon.*" *Id.* at 120 (emphasis added). Again, Strumpf's testimony was somewhat more ambiguous than that—she testified that "Mr. Spinale asked me to draw up a contract as to *how the negotiations stood.*" Tr. of Apr. 1, 1996 Proceedings at 902 (emphasis added). Nevertheless, the August 16 fax supports the ALJ's interpretation of her testimony, for it indicates that the contract Strumpf had drafted was ready to be signed and, therefore, indeed covered "what had been agreed upon." On the basis of this letter, a rational trier of fact could conclude that the accompanying contract document embodied an agreement already reached by the parties.

In short, substantial evidence in the record supports the ALJ's findings that Strumpf had authority to enter into an agreement, and that the parties did in fact reach an agreement, on June 10, 1994. Accordingly, we decline to disturb these findings.

*The April 17, 1995 discharge of employees.*

Substantial evidence also supports the ALJ's finding that the Company discharged a large group of employees on April 17 as a result of their union activities. Section 8(a)(3) of the Act prohibits an employer from discriminating "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). An employee's discharge violates the Act if the employee's protected conduct was a "substantial" or "motivating" factor prompting the discharge. *See*

*NLRB v. Transportation Mgmt. Corp.,* 462 U.S. 393, 402–04, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (approving test set forth in *Wright Line, A Division of Wright Line, Inc.,* 251 N.L.R.B. 1083, 1083–88 (1980)), *enforced,* 662 F.2d 899 (1st Cir. 1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)); *see also Director, Office of Workers' Compensation Programs v. Greenwich Collieries,* 512 U.S. 267, 276–78, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994) (clarifying that the test places burden of persuasion, not production, on party challenging discharge); *Holo–Krome Co. v. NLRB,* 954 F.2d 108, 111–12 (2d Cir.1992) (denying petition for rehearing) (explaining *Wright Line* test); *FES (A Division of Thermo Power),* 331 N.L.R.B. No. 20, 2000 WL 627640, at *21– *22 (May 11, 2000) (revising the *Wright Line* test in the hiring context but not in the discharge context).

■■■■ Under the Board's two-step *Wright Line* test, as clarified by the Supreme Court in *Greenwich Collieries,* 512 U.S. at 276–78, 114 S.Ct. 2251, the Board's General Counsel must first present evidence that proves that protected conduct was a motivating factor in the discharge. *See also Holo–Krome,* 954 F.2d at 111–12; *Wright Line,* 251 N.L.R.B. at 1087. If this burden of persuasion is met, the employer may avoid liability only if it demonstrates by a preponderance of the evidence "that it would have reached the same decision absent the protected conduct." *Id.* The Board may consider direct or circumstantial evidence that an employee's protected activities motivated the employer's action of discharging him. *See id.*

In the case at bar, there were some variations in the testimony concerning the events at the Hunts Point market and the identities of the people present on April 17, 1995, but it is undisputed that Spinale told a large number of employees that there was no work for them that day; that he did so immediately after the informational picket line was set up; that he knew about the picket line; and that he did not rehire 22 of these employees.[18]

Spinale testified in the proceedings before the ALJ that most of his employees failed to report to work on time at 8:00 a.m. on April 17, 1995, and that this forced him to call his customers, cancel their orders, and send the employees home. The Company argues that these employees were not fired, but were merely sent home for the day, and that those who were fired were discharged two days later, on April 19, for the legitimate reason that the Company no longer had any potato-packaging work for them to do. However, the ALJ implicitly credited Ruggiero's testimony, which was corroborated by other witnesses, that the Company's nearly 80 employees tried to report to work just before 8:00 a.m., but that Spinale—who had seen the picket—told the majority of them that he had no work for them. *See G & T,* 326 N.L.R.B. at 122; *see also id.* at 114 n. 5. In addition, the ALJ credited Ruggiero's testimony that Spinale made a statement to the effect that "he didn't want anyone [working] that would be affiliated or socializing with the union." *Id.* at 115 & n. 7 (adopting ALJ's finding that Spinale made statements reflecting animus, and quoting corroborating testimony of various witnesses). These credibility determinations

---

**18.** Appendix B to the ALJ's decision lists 24 employees who were not recalled on April 19, but notes that two of them returned the following week. *See G & T,* 326 N.L.R.B. at 127. Appendix C lists four employees who were not working on April 17 but who were not permitted to work when they tried to return. *See id.* Because these four names also appear in Appendix B, the total number of discharged employees is 22.

are not "incredible or flatly contradicted by undisputed documentary testimony," *Katz's Delicatessen*, 80 F.3d at 763, and we will not disturb them.

The record also supports the ALJ's conclusion, adopted by the Board, that the Company's failure to rehire 22 employees on April 19, 1995, was unlawful. *See G & T*, 326 N.L.R.B. at 114–16, 124–25. As the ALJ found, the timing of Spinale's decision to dismantle the machine and send the parts to M & M—on April 17, 1995, the day that increased union activity "indicated that the Union was serious about pressing him to sign a contract," *id.* at 123—seriously undermines the Company's argument that the decision to discontinue this operation was motivated by considerations other than the employees' union activities. Although Spinale testified that he had been concerned for some time about the unprofitability of the potato-packaging operation, *see* Tr. of Mar. 11, 1996 Proceedings at 622, the record supports the ALJ's conclusion that the Company failed to demonstrate by a preponderance of the evidence, as it must, "that it would have done what it did, *when it did*, in the absence of the [employees'] union activities." *We Can, Inc.*, 315 N.L.R.B. 170, 171–72 (1994) (emphasis added) (rejecting poor financial condition as reason for discharges where company had been in poor financial condition for "quite some time" before union activities began); *see also Lear–Siegler, Inc., No–Sag Prods. Div.*, 295 N.L.R.B. 857, 859 (1989) (holding that economic reasons cannot justify relocation resulting in layoffs where such economic reasons for relocation existed months before employees sought union representation, and relocation followed immediately thereafter).

In short, the evidence in the record adequately supports the ALJ's finding that a group of employees was discharged on April 17, 1995, and not rehired as a result of its protected activities.

*The April 19, 1995 unilateral rehiring of certain employees without regard to seniority.*

The Company does not deny that it rehired certain employees without regard to seniority, without negotiating with the Union. Rather, it argues that it had no obligation to rehire in order of seniority because the parties' inability to reach an agreement meant that there was no seniority clause in effect. In light of our conclusion that the record supports the ALJ's finding that the parties reached an agreement on June 10, 1994, we do not disturb the conclusion that the Company violated the Act by rehiring employees without regard to seniority.

*Slow Pack as an alter-ego of G & T.*

On April 19, 1994, two days after the events at the Hunts Point market, the Company created a new company, Slow Pack, Inc., and shifted its G & T employees onto Slow Pack's payroll. *See G & T*, 326 N.L.R.B. at 123. The parties have stipulated that Slow Pack and G & T constitute a single integrated enterprise.

The ALJ found that Slow Pack was an alter ego of G & T; that it was formed to avoid collective bargaining obligations; and that it was liable for the Company's unfair labor practices to the same extent as G & T. *See id.* These findings are supported by substantial evidence in the record.

In determining whether one company is the alter ego of another, we examine, *inter alia*, whether there exists "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 748 (2d Cir.1996) (internal quotation marks omitted); *see also Goodman Piping*

*Prods., Inc. v. NLRB,* 741 F.2d 10, 11 (2d Cir.1984). Evidence that a desire to avoid union obligations motivated the formation of a corporation may also be relevant to a finding of alter ego status, but a finding of "anti-union motivation is [not] necessary." *Goodman Piping,* 741 F.2d at 12; *cf. Lih-li Fashions,* 80 F.3d at 748 (explaining that "focus" of alter ego inquiry is on whether there was an intent to avoid union obligations). Alter egos are bound by each other's collective bargaining agreements. *See id.* (citing, *inter alia, Howard Johnson Co. v. Detroit Local Joint Executive Bd.,* 417 U.S. 249, 259 n. 5, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *Southport Petroleum Co. v. NLRB,* 315 U.S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718 (1942)); *see also Doctor's Assocs., Inc. v. Distajo,* 66 F.3d 438, 453 (2d Cir.1995) (explaining that where one company is an alter ego of another, "the acts of one are the acts of all" (internal quotation marks omitted), *cert. denied,* 522 U.S. 948, 118 S.Ct. 365, 139 L.Ed.2d 284 (1997); *NYP Acquisition Corp. and its alter ego NYP Holdings, Inc.,* 332 N.L.R.B. No. 97, 2000 WL 1643528, at *8 n. 10 (Oct. 31, 2000) (comparing a "successor" company, which "assumes only the obligation to recognize and bargain with the exclusive bargaining representative of its predecessor's employees," with an "alter ego" company, which "is required to assume its predecessor's collective bargaining agreement as well").

The Company concedes that the formation of Slow Pack changed nothing other than the name of the corporation, and does not contest the ALJ's findings that Slow Pack and G & T had common ownership and management, the same business purpose and place of business, and substantially the same equipment and employees. *See G & T,* 326 N.L.R.B. at 123. In fact, the only difference between the two companies, other than their names, seems to be the absence of the potato-packaging machine—itself the result of an attempt to avoid obligations toward the Union.

The Company argues that Slow Pack was not formed in order to avoid collective bargaining obligations. However, in light of the ALJ's finding that the Company and Slow Pack shared a common ownership, management, business purpose, and place of business, as well as substantially the same equipment and employees, a showing of anti-union animus is not necessary to establish that Slow Pack is G & T's alter ego. *See Goodman Piping,* 741 F.2d at 12. Moreover, as the Board noted in affirming the ALJ's finding of alter ego status, Spinale conceded in his testimony that "Slow Pack was set up to replace G & T when [the Company] had the problem with [the Union]." *G & T,* 326 N.L.R.B. at 114 n. 1. Finally, nothing in the record contradicts the ALJ's determination that the timing of Slow Pack's formation—just two days after the events of April 17, 1995—belies the Company's argument that its motives were wholly innocent. In fact, the Company has not suggested that any other motive existed for forming Slow Pack, arguing only that it acted on the "possibly ill-advised" counsel of a labor lawyer. Resp. Br. at 62. Substantial evidence therefore supports the ALJ's finding that Slow Pack is an alter-ego of G & T. We decline to disturb this finding, or the conclusion that follows from it—namely, that Slow Pack is liable for unfair labor practices and bound by the contract to the same extent as G & T.

We conclude, in sum, that the record contains substantial evidence supporting the factual findings of the ALJ, adopted by the Board. In particular, there is substantial evidence: that the parties reached an agreement on June 10, 1994, which Spinale failed to sign; that the Company discharged employees as a result of their protected activities; that the Company unilaterally subcontracted certain opera-

tions; and that the Company unilaterally rehired employees without regard to seniority. We further conclude that these findings adequately support the Board's determination that the Company violated Section 8(a)(1), (3), and (5) of the Act by engaging in unfair labor practices.

**B.**

 Section 10(c) of the Act empowers the Board to issue cease and desist orders and impose affirmative remedies if it finds violations of the Act. *See* 29 U.S.C. § 160(c); [19] *see also Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Such "remedies must be tailored to fit the nature and extent of the violations found, and [ ] the Act does not confer upon the Board 'a punitive jurisdiction enabling the Board to inflict ... any penalty it may choose because [respondent] is engaged in unfair labor practices, even though the Board be of the opinion that the policies of the Act might be effectuated by such an order.'" *Teamsters Union Local No. 688*, 326 N.L.R.B. No. 74, 1998 WL 598581, at *9 (Aug. 27, 1998) (Member Fox, dissenting in part) (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 235–36, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Carpenter Sprinkler Corp. v. NLRB*, 605 F.2d 60, 67–68 (2d Cir.1979) (explaining that a cease and desist order must be remedial, not punitive). Under the Act, remedies "are 'designed to vindicate the public policy of the statute by making the employees whole for losses suffered on account of an unfair labor practice.'" *NLRB v. Fugazy*

*Cont'l Corp.*, 817 F.2d 979, 982 (2d Cir. 1987) (quoting *Nathanson v. NLRB*, 344 U.S. 25, 27, 73 S.Ct. 80, 97 L.Ed. 23 (1952)). However, a remedy must not impose an undue burden on the employer. *See Fibreboard*, 379 U.S. at 216 & n. 10, 85 S.Ct. 398; *see also Lear–Siegler*, 295 N.L.R.B. at 861 (choosing the "unduly burdensome" standard over the more stringent "continued viability" standard). We review the remedy chosen by the Board for abuse of discretion. *See Katz's Delicatessen*, 80 F.3d at 770; *Bagel Bakers Council of Greater New York v. NLRB*, 555 F.2d 304, 305 (2d Cir.1977).

The Company challenges the cease and desist order and two of the affirmative remedies imposed by the Board: the restoration of the potato-packaging operation and the calculation of the interest on pension and welfare fund contributions owed. We consider these matters in turn.

*The cease and desist order.*

 A cease and desist order may "restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1102 (2d Cir.1972) (quoting *NLRB v. Express Publ'g Co.*, 312 U.S. 426, 435, 61 S.Ct. 693, 85 L.Ed. 930 (1941)). A so-called broad order is one containing a provision generally prohibiting the employer "from violating *in any manner* the rights guaranteed to [its] employees" under the

**19.** In relevant part, Section 10(c), codified at 29 U.S.C. § 160(c), provides:

If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action[,] including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter....

Act. *NLRB v. Windsor Castle Health Care Facilities, Inc.*, 13 F.3d 619, 624 (2d Cir.1994) (emphasis added); *see also Hickmott Foods, Inc.*, 242 N.L.R.B. 1357, 1357 (1979) (distinguishing a "broad" order, which prohibits employer from violating employees' rights "in any manner," from a "narrow" order, which prohibits employer from violating rights in any manner "like or related" to previous violations). A broad order is justified "only when a respondent is shown to have a proclivity to violate the Act, or has engaged in such egregious or widespread misconduct as to demonstrate a general disregard for the employees' fundamental statutory rights." *Windsor Castle*, 13 F.3d at 624 (internal quotation marks omitted).

■ As modified by the Board, the cease and desist order issued in this case is alternately narrow *and* broad: it narrowly prohibits the Company from engaging in various specific acts and, in addition, contains a provision broadly prohibiting the Company from *"[i]n any other manner* interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act." *G & T*, 326 N.L.R.B. at 126 (emphasis added). We agree with the Board that the cease and desist order, including this broadly worded provision, is warranted by the ALJ's findings of fact and, therefore, does not exceed the bounds of the permissible.

The order before us prohibits the Company from committing acts "whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Manor Nursing Ctrs.*, 458 F.2d at 1102. Specifically, it prohibits the Company from: refusing to sign the June 10, 1994 contract; discharging or laying off employees due to their union activities; unilaterally subcontracting its potato-packaging operation; unilat-

erally granting some of its employees wage increases; and in any way interfering with conduct protected under the Act. *See G & T*, 326 N.L.R.B. at 126. The order therefore properly "restrain[s] acts which are of the same type or class as unlawful acts which ... have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Manor Nursing Ctrs.*, 458 F.2d at 1102 (internal quotation marks omitted). The record in this case supports each of these specific provisions.

In addition, the ALJ concluded, and the Board agreed, that the broadly worded aspect of the Order was warranted because the Company "has previously violated the Act" and its violations were "substantial and serious." *G & T*, 326 N.L.R.B. at 125–26. In imposing a broad cease and desist order based on this conclusion, the Board did not, on the facts in this case, abuse its discretion. The Company had previously violated the Act by failing to make payments due to the pension and welfare plans. *See id.* at 123–24. Moreover, after we had affirmed the judgment that required such payments, the Company continued to violate the Act in the broad range of ways described above, thus "demonstrat[ing] a general disregard for [its] employees' fundamental statutory rights." *Windsor Castle*, 13 F.3d at 624 (internal quotation marks omitted). Accordingly, with one exception, we decline to disturb or modify the cease and desist order, including its broadly worded provision.

The exception is the provision prohibiting the Company from "[s]ubcontracting or transferring [the Company's] potato-packaging operations because of the union activity of its employees." Modified Order, ¶ 1(d), *G & T*, 326 N.L.R.B. at 126. A related affirmative remedy imposed by the

Board requires the Company to reinstate the potato-packaging operation. Because we reverse this affirmative requirement, as explained below, we also reverse this related prohibition in the cease and desist order.

*The reinstatement of the potato-packaging operation and rehiring of the 22 employees.*

■■■■■ The Board may, pursuant to Section 10(c) of the Act, require an employer to "take such affirmative action[,] *including reinstatement of employees with or without back pay,* as will effectuate the policies of [the Act]." 29 U.S.C. § 160(c) (emphasis added). In cases involving discriminatory subcontracting or the partial closing of operations, the Board may order an employer to reinstate the operation in question and to rehire discriminatorily laid-off employees. *See Olivetti Office USA, Inc. v. NLRB,* 926 F.2d 181, 190 (2d Cir.1991) (discriminatory subcontracting); *Textile Workers Union of America v. Darlington Mfg. Co.,* 380 U.S. 263, 274–75, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965) (partial closing). However, as we have previously explained, "we have the authority to modify an order to ensure that it ... effectuate[s] [the Act's] policies. Where the Board's order is insufficiently 'tailored to the unfair labor practice it is intended to redress,' or is unduly burdensome on the employer, it may be modified." *KBI Sec. Serv., Inc. v. NLRB,* 91 F.3d 291, 295 (2d Cir.1996) (internal citations omitted) (quoting *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 900, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) (insufficiently tailored standard) and citing *Fibreboard,* 379 U.S. at 216 & n. 10, 85 S.Ct. 398 (unduly burdensome standard)).

■■■ In *Lear–Siegler,* the Board explained that requiring an entity "to reopen a demonstrably unprofitable facility might not be found to threaten the survival of the enterprise if it could offset losses from the reopened facility with profits from others; however, in many instances requiring such cross-subsidization (for indefinite periods) might well be found to be unduly burdensome." *Lear–Siegler,* 295 N.L.R.B. at 861 (deciding that the evidence in that case did not establish undue burden). On reviewing the record in this case, we conclude that the Company has established by a preponderance of the evidence, *see Wright Line,* 251 N.L.R.B. at 1087, that restoring the potato-packaging operation would indeed be unduly burdensome.

Three sets of facts undergird our conclusion. First, it is undisputed that because the old machine was dismantled and the parts were dispersed, the Company would have to purchase a new, computerized machine to comply with the Board's Order. This new machine would cost between $130,000 and $150,000. Second, both Spinale and G & T's former accountant, Robert Falk, testified without contradiction that after the Company moved to the Hunts Point market from its prior location, the potato-packaging operation suffered continuous monthly losses over a long period time. Indeed, in a 1991 letter to the Union, Strumpf had written that "G & T does not believe that it will be able to be competitive packing potatoes [at the Hunts Point market] because of added expenses, antiquated equipment, Mr. Spinale's health, the Conrail surcharge, and loss of potato volume." [20] Third, nothing in the record contradicts the Company's claim that it simply does not have enough space to install a new machine in its Hunts Point

---

20. Although the potato-packaging operation's total net profit for 1994 and 1995 was $254,000, Spinale testified without contradiction that these apparent profits were large-ly paper profits—they were the result, *inter alia,* of a reallocation of expenses between G & T and Tray Wrap to make G & T's bottom line appear healthier than it actually was.

facility and, therefore, that reinstating the potato-packaging operation is all but impossible.

In short, the Company has demonstrated by a preponderance of the evidence that to purchase a new machine and reinstate the potato-packaging operation would be unduly burdensome: such a machine would impose a financial burden on G & T so large as to render the firm virtually unprofitable, and would simply not fit in the Company's existing facility. On this combination of facts, we deny the Board's petition for enforcement of its order insofar as it requires the Company to reinstate the potato-packaging operation.

For the same reasons, we decline to enforce the order insofar as it requires the Company to rehire the 22 employees who worked in the potato-packaging operation. Since we have concluded that reinstatement of the potato-packaging operation would be unduly burdensome to the Company, we cannot expect it to rehire the 22 affected employees to perform that operation. Accordingly, we remand the cause to the Board for consideration of an alternative means of providing a remedy that will effectuate the "general reparative policies of the [Act]," *Sure–Tan*, 467 U.S. at 901, 104 S.Ct. 2803, by "making the employees whole for losses suffered on account of an unfair labor practice," *Fugazy*, 817 F.2d at 982, without proving "unduly burdensome" to the employer, *Fibreboard*, 379 U.S. at 216 & n. 10, 85 S.Ct. 398.

In *KBI Security*, 91 F.3d 291, an employer was found to have unlawfully discharged two employees because of their union activities, but the employer claimed that the employees had committed theft while at work and would therefore have been discharged anyway. *See id.* at 295–96. In that case, we declined to enforce an order of the Board requiring the reinstatement of the two employees on the ground

that if the employees had indeed committed theft, the requirement that they be rehired would place an undue burden on the employer—even if the employees' union activities had been a motivating factor in their discharge—and we remanded the case to give the Board a chance to develop the record in order to determine whether the employees had indeed committed the alleged thefts. *See id.* In other words, at the time of the unlawful discharge in that case, *both* proper and improper reasons for the discharge existed—while the latter amounted to a motivating factor in the discharge, *see Transp. Mgmt.*, 462 U.S. at 400, 103 S.Ct. 2469, the former rendered reinstatement an undue burden, *see Fibreboard*, 379 U.S. at 216 & n. 10, 85 S.Ct. 398.

The instant case presents an analogous situation, because the record supports *both* the finding that the employees' protected activities motivated the dismantling of the potato-packaging machine on April 17, 1995, *and* the conclusion that reinstatement of the operation would have been unduly burdensome, if not immediately after the dismantlement, then soon thereafter—and, in any event, long before the hearing before the ALJ.

 Even so, there is no reason to foreclose the possibility of arriving at a reasonable remedy that will effectuate the general reparative policies of the Act by making the affected employees as reasonably close to whole as possible without imposing an undue burden on the employer. Counsel for the Company indicated at oral argument that the affected employees never received any back pay, and conceded that some amount of back pay could provide a reasonable substitute for the unduly burdensome remedy of buying a new potato-packaging machine and reinstating the entire operation. *See* Tr. of Oral Argu-

ment at 7.[21] We agree. However, we also recognize that the Act "vest[s] in the Board the primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act." *Sure–Tan*, 467 U.S. at 898, 104 S.Ct. 2803. Accordingly, we remand to the Board for reconsideration of the remedy, with instructions that it impose a make-whole remedy that provides a reasonable substitute, under the circumstances, for that which we have found unduly burdensome.[22]

We note that we are not deferring the resolution of these issues to the Board's so-called compliance proceedings—which are by regulation committed in the first instance to the Regional Director, *see* 29 C.F.R. §§ 102.52, 102.54;[23] *see also Sure–Tan*, 467 U.S. at 902, 104 S.Ct. 2803 ("[T]he Board's normal policy [is to] modif[y] its general reinstatement and backpay remedy in subsequent compliance proceedings as a means of tailoring the remedy to suit the individual circumstances of each individual discharge."). Rather, we are declining to enforce the Board's Order insofar as it imposes an unduly burdensome remedy and remanding the cause to the Board, pursuant to 29 U.S.C. § 160(e),[24] so that it may adduce additional evidence in order to arrive at a reasonable alternative remedy. *See Sure–Tan*, 467 U.S. at 905, 104 S.Ct. 2803 (When an appellate court concludes that the Board has erred in imposing a remedy, "the appropriate course [is] to remand back to the Board for reconsideration."). Because we are declining to enforce cer-

21. Counsel for the Company stated at oral argument that 18 to 20 of the 22 employees who were discharged and not rehired on April 19, 1995, *see ante* at note 18, subsequently returned to work. *See* Tr. of Oral Argument at 6. However, according to Appendix B of the ALJ's decision, of the 24 employees who were laid off on April 17 and not recalled on April 19, only two returned. *See G & T*, 326 N.L.R.B. at 127.

22. If, on remand, the Board agrees that a back pay award is indeed appropriate, it must recall that in order to be equitable, such a remedy "must be sufficiently tailored to expunge only the actual, and not merely speculative, consequences of unfair labor practices." *Sure–Tan*, 467 U.S. at 901, 104 S.Ct. 2803.

23. 29 C.F.R. § 102.52 provides that "[a]fter entry of a Board order directing remedial action, or the entry of a court judgment enforcing such order, the Regional Director shall seek compliance from all persons having obligations thereunder." Pursuant to 29 C.F.R. § 102.54(a)

[i]f it appears that controversy exists with respect to compliance with an order of the Board which cannot be resolved without a formal proceeding, the Regional Director may issue and serve on all parties a compliance specification in the name of the Board. The specification shall contain or be accompanied by a notice of hearing before an administrative law judge at a place therein fixed and at a time not less than 21 days after the service of the specification.

24. In relevant part, 29 U.S.C. § 160(e) provides that on reviewing a petition of the Board for enforcement of an order, a court "shall have power to ... set[ ] aside in whole or in part the order of the Board." This section empowers us to order

additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and *shall file its recommendations, if any, for the modification or setting aside of its original order.* Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review ... by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of Title 28.
(emphasis added).

tain aspects of the Board's remedy, compliance proceedings "tailoring th[at] remedy," *id.* at 902, 104 S.Ct. 2803, would be premature. *See Katz's Delicatessen,* 80 F.3d at 771 ("Compliance determinations are routinely made 'after entry of a Board order directing remedial action, or the entry of a court judgment enforcing such [an] order.' " (quoting 29 C.F.R. § 102.52)).

As the Board has acknowledged in the past, its "usual policy of leaving the details of the remedy to the compliance process . . . has met with mixed reviews in the courts of appeals." *Lear–Siegler,* 295 N.L.R.B. at 862, 872 n. 31 (citing cases); *see also We Can,* 315 N.L.R.B. at 175–76 (acknowledging that the Board's "established practice of leaving the details of the remedy to the compliance process" has caused some confusion). The courts' ambivalence toward this practice may be due to the fact that leaving the "details" of the remedy to a later proceeding often "necessitat[es] piecemeal review" of Board orders. *Holo–Krome,* 907 F.2d at 1348.

We have previously grappled with the difficulties caused by the Board's practice. *See, e.g., Katz's Delicatessen,* 80 F.3d at 770–71; *Holo–Krome,* 907 F.2d at 1347–48; *see also NLRB v. Coca–Cola Bottling Co.,* 55 F.3d 74 (2d Cir.1995). In *Katz's Delicatessen,* we enforced an order of the Board requiring an employer to make retroactive payments to a union's pension and welfare funds where, "[o]n its face," the order simply required the employer to "plac[e][its] employees in the same position that they would have been in, had [the employer] not unlawfully withdrawn recognition." *Katz's Delicatessen,* 80 F.3d at 770 (internal quotation marks omitted). Comparing the Board's compliance stage to "the damages phase of a civil proceeding," *id.* at 771 (quoting *Coca–Cola Bottling Co.,* 55 F.3d at 77); *see also id.* (observing that "compliance proceedings

seem analogous to the damages phase of a civil proceeding, or the sentencing phase of a criminal proceeding"), we left resolution of the details of the remedy to the compliance stage, acknowledging that although the evidence supported the basic remedy imposed by the Board, the implementation of its details would require further development of the record at compliance. *See id.*

In *Holo–Krome,* on the other hand, we declined to defer the "details" of a Board remedy to the compliance stage where the remedy required an employer to reinstate an employee. *See Holo–Krome,* 907 F.2d at 1348. The employer in *Holo–Krome* argued that the ALJ had erred in imposing the reinstatement remedy because the employer's obligation to rehire the employee had ended sometime prior to the hearing before the ALJ. *See id.* Conceding that the employer was correct, the Board nevertheless declined to overturn the ALJ's conclusion because "its practice [was] to consider the specifics of backpay and reinstatement at the compliance stage of its proceedings, following appellate review of liability determinations." *Id.* We declined to enforce this aspect of the order, reasoning that the Board's decision to leave the resolution of this question to the compliance stage was "less a choice of remedy than of procedure." *Id.* Instead, we remanded to the Board, instructing it to determine whether the employer indeed had an obligation to rehire the employee in question. *See id.*

▮ *Katz's Delicatessen* and *Holo–Krome* provide us with some guidance as to when it is appropriate to leave the details of a remedy to the compliance stage or to remand the cause to the Board for further development of the record. Those cases teach that an ALJ's conclusions concerning both a party's liability and the concomitant remedy, adopted by

the Board, must be fully supported by the record before the ALJ, and that the remedial "details" that are deferred to the compliance stage must be true "details": they must merely flesh out and follow from the remedy ordered by the Board. If we *decline to enforce* any aspect of a Board order, the further development of the record is by definition not a mere detail, and compliance proceedings would be wholly premature. In such circumstances, the appropriate procedure is to remand the cause to the Board for further proceedings consistent with our decision. *See Sure–Tan,* 467 U.S. at 906, 104 S.Ct. 2803 (explaining that when an appellate court refuses to enforce a Board remedy, remand is the appropriate procedure). Adherence to this reasoning, by the Board and by us, will enable us to avoid "piecemeal review," *Holo–Krome,* 907 F.2d at 1348, of Board orders.

We realize that the Supreme Court has approved of the Board's practice of leaving the details of the remedy to the compliance stage, albeit in *dictum. See Sure–Tan,* 467 U.S. at 902, 104 S.Ct. 2803 ("[T]he Board's normal policy [is to] modif[y] its general reinstatement and backpay remedy in subsequent compliance proceedings as a means of tailoring the remedy to suit the individual circumstances of each discriminatory discharge."). However, this general statement presumes judicial enforcement of a remedy imposed by the Board. We are not faced with such a situation here. If the Company had argued that a change in circumstances had occurred at some point *after* the hearing before the ALJ, and that this change rendered the reinstatement remedy unduly burdensome, we could simply enforce the Board's reinstatement order and leave the presentation of the *new* evidence of undue burden to the compliance stage, *see id.,* permitting judicial review of the question of undue burden at a later time. However,

we have concluded that the Company in this case has *already* established—at the hearing before the ALJ—that reinstatement of the potato-packaging operation would be unduly burdensome. Therefore, we cannot defer the "details" of this matter to the Board's compliance stage. Rather, we hold the Order unenforceable insofar as it requires reinstatement of the potato-packaging operation and rehiring of the 22 affected employees, and remand to the Board for reconsideration of the remedy. Such further proceedings should be conducted by the Board, or by an ALJ for consideration by the Board, and then filed with this Court "for the modification or setting aside of [the] original order." 29 U.S.C. § 160(e).

We are mindful that our remand poses a risk of further delay of the kind described in *Lear–Siegler,* 295 N.L.R.B. at 861. In that case, the Board denied a motion to reopen the record and instead left the further development of the record to the compliance stage, because reopening the record "would entail another hearing before an administrative law judge, with a possible appeal to the Board, before compliance proceedings could even begin." *Id.* Nevertheless, the Supreme Court has stated unequivocally that when an appellate court concludes that the Board has erred in imposing a remedy, "the appropriate course [is] to remand back to the Board for reconsideration." *Sure–Tan,* 467 U.S. at 906, 104 S.Ct. 2803. Here, since we have vacated one portion of the Board's remedy, we must remand to the Board so that it may consider an alternative.

*The interest on pension and welfare payments due.*

The Company challenges the ALJ's method of calculating the interest on moneys owed by the Company to the Union's pension and welfare funds. As noted

above, *see ante* at note 3, we previously granted the Board's petition for enforcement of its order requiring the Company to make whole the Union's pension and welfare funds for payments unlawfully withheld since January 1993. *See G & T,* 326 N.L.R.B. at 115 n. 6. The Company cannot now, and does not, challenge the ALJ's calculation of these amounts. Rather, it challenges the ALJ's calculation of the interest due on these amounts. However, our refusal to enforce the Order in the case at bar—insofar as it requires the Company to reinstate the potato-packaging operation and rehire its 22 employees—will also affect the calculation of the base amounts owed to the benefit funds, beginning on whatever date the Board reasonably determines that reinstatement of the operation would have proved unduly burdensome to the employer. Accordingly, we now address (1) the ALJ's calculation of the base amounts owed beginning on a date to be determined by the Board, and (2) the ALJ's method of calculating the interest due on all the amounts owed—that is, from the date payments to the funds were withheld by the Company (January 1993) to the present.

*(1) Base amounts owed beginning on the date to be determined by the Board.*

The calculation of the amounts owed to the pension and welfare funds is based on the payments the Company should have made per month, per employee, to the funds beginning in January 1993. *See G & T,* 326 N.L.R.B. at 124; *see also id.* at 128–29 (Appendices D and E, setting forth amounts due). For the period beginning on April 19, 1995, the day that the Company failed to rehire the 22 employees who were formerly employed in the potato-packaging operation, the ALJ based his calculation on "the number [of employees] who actually worked *plus the number who would have worked but for the illegal discrimination.*" *Id.* at 124 (emphasis added); *see also* Summary of Pension and Welfare Monies Owed, n.* * (explaining that "[f]rom 4/19/95 to the present the actual amount of employees that worked during a given week has been increased by 22 to reflect the number of discriminat[ees] that were not recalled"). Because the ALJ's calculations run only through February 1996 (the date through which the General Counsel's compliance specification runs),[25] the ALJ noted that "the General Counsel may issue a new backpay specification or reopen this one as appropriate" for amounts due after February 1996. *G & T,* 326 N.L.R.B. at 124.

■ On remand to the Board, the base amounts due to the pension and welfare funds should be modified by the Board itself, or by an ALJ for consideration by the Board, *see* 29 U.S.C. § 160(e)[26]—rather than by the Regional Director in a compliance proceeding pursuant to 29 C.F.R. § 102.52[27]—to reflect our conclusion that, as of the date to be determined by the Board, it would be unduly burdensome to require the Company to rehire the 22 employees who once operated the potato-packaging machine. We understand

---

25. The ALJ's recommended order refers to the General Counsel's compliance specification setting forth the amounts of backpay owed as a "backpay specification." *G & T,* 326 N.L.R.B. at 123. As we have explained, "[a] compliance specification sets forth an NLRB regional director's determination of monetary, make-whole, reinstatement, or oth-

er remedies required by an NLRB order directing remedial action." *Coca–Cola Bottling Co.,* 55 F.3d at 77 n. 2 (citing 29 C.F.R. §§ 102.52, 102.54(a)).

26. *See ante* at note 24.

27. *See ante* at note 23.

that because we previously granted the Board's petition for enforcement of its earlier order that the Company make whole the pension and welfare funds, *see ante* at note 3, the current proceedings with respect to the interest due on these underpayments *are* the "compliance stage" for that order. However, as discussed above, *see ante* at 123–25, our refusal to enforce this aspect of the Board's order obliges us to remand the cause for further proceedings consistent with this opinion, rather than to defer the details of this matter to a (second) compliance stage. *See Sure–Tan,* 467 U.S. at 906, 104 S.Ct. 2803. Again, such further proceedings should be conducted by the Board, or by an ALJ for review by the Board, and then filed with this Court "for the modification or setting aside of [the] original order." 29 U.S.C. § 160(e).

On remand, therefore, the Board's calculation of moneys owed to the pension and welfare funds must assume that the 22 employees discharged on April 19, 1995 would have worked only through a date to be determined by the Board; after such date, the calculation of the amounts owed should no longer include these 22 in the total number of employees.

*(2) The interest due.*

 An award of interest is, of course, well within the Board's remedial authority. *See, e.g., Reserve Supply Corp. v. NLRB,* 317 F.2d 785, 789 (2d Cir.1963) (enforcing order including interest on back pay award). In *Reserve Supply Corp.,* we explained that "[w]hen the statutes are silent," as they are here, "the question of whether interest shall be awarded is to be determined in accordance with the historic judicial principle that one for whose financial advantage an obligation was assumed or imposed, and who has suffered actual money damages by another's breach of that obligation, should be fairly compensated for the loss thereby sustained." *Id.* (internal quotation marks omitted). In calculating the interest on back pay awards, the Board has since 1987 used the "short-term Federal rate." *See New Horizons for the Retarded, Inc.,* 283 N.L.R.B. 1173, 1173 (1987) (describing the "short-term Federal rate"). However, in calculating interest due on payments owed to funds such as the pension and welfare funds at issue here, the Board had earlier explained that "[b]ecause the provisions of employee benefit fund agreements are variable and complex," this amount "may be determined, depending upon the circumstances of each case, *by reference to provisions in the documents governing the funds at issue* and, where there are no governing provisions, to evidence of any loss directly attributable to the unlawful withholding action...." *Merryweather Optical Co.,* 240 N.L.R.B. 1213, 1218 n. 7 (1979) (emphasis added).[28]

Applying *Merryweather,* the ALJ found that the 1989–1992 contract and the 1994 unsigned contract document incorporate the funds' trust documents by reference and, relying on those documents, adopted

---

**28.** Although *New Horizons* partially (and implicitly) overruled *Merryweather* (by explicitly superseding *Florida Steel Corp.,* 21 N.L.R.B. 651 (1977), which was cited in *Merryweather*), *see New Horizons,* 283 N.L.R.B. at 1173–74, the rule in *Merryweather* concerning employee benefit funds specifically did not rely on *Florida Steel, see Merryweather,* 240 N.L.R.B. at 1216, 1218 n. 7, and, therefore, has continued vitality.

In *Merryweather,* the Board explained that the calculation of interest due on payments unlawfully withheld from pension and welfare funds should be left to the compliance stage. *See id.* As noted above, the current proceedings with respect to the interest due on these underpayments *are* the compliance stage for that order.

the rate of 1.5 percent per month, or 18 percent per year, set forth in these documents. *See G & T,* 326 N.L.R.B. at 123–24. The Board declined to adopt the ALJ's finding that the contracts incorporate the trust documents by reference, but nevertheless affirmed the ALJ's reliance on the rate provided in these documents, reasoning that *Merryweather* permits reliance on such documents for purposes of a remedy without requiring that the contract actually incorporate them. *See id.* at 114 n. 4.

 We agree with the Board that the contracts do not incorporate the trust documents by reference: both the 1989–1992 contract and the 1994 unsigned contract mention the pension and welfare funds in clauses requiring the Company to make payments to these funds, but neither document mentions the trust documents themselves. *See* Expired CBA at ¶ 25(a)-(b); Unsigned CBA ¶ 23(a)-(b). Nevertheless, we decline to enforce the Order insofar as it imposes this award of interest, and remand for further development of the record concerning what would be an appropriate rate. Although the Board has broad discretion in fashioning remedial orders, its orders may not cross the line that divides the remedial from the punitive. *See Manhattan Eye Ear & Throat Hosp. v. NLRB,* 942 F.2d 151, 156–57 (2d Cir. 1991). The record before us is insufficiently developed for us to determine whether the 18 percent interest rate bears some reasonable relationship to the actual losses suffered by the funds due to the Company's underpayments, or whether it amounts to a punitive measure against the Company. Without any information in the record regarding the performance of the funds during the period in question, an award of 18 percent interest may simply result in a windfall to the Union.

While it is true that *Merryweather* directs the Board to look at the trust documents in the first instance, in our view it is also significant that *Merryweather* describes the relevant evidence as "evidence of any loss *directly attributable to the unlawful withholding.*" *Merryweather Optical Co.,* 240 N.L.R.B. at 1218 n. 7 (emphasis added). Therefore, we remand with instructions to the Board to develop the record further in order to arrive at an interest rate that bears a reasonable relationship to those losses directly attributable to the Company's unlawful withholding.

In sum, we conclude that the record in this case justifies the broad cease and desist order and the affirmative remedies imposed by the Board, except: (1) to the extent that these require the Company to reinstate its potato-packaging operation and rehire the 22 affected employees, which we conclude would be unduly burdensome; (2) to the extent that the calculation of base amounts owed to the Union's pension and welfare funds assumes that the 22 discharged employees would have worked indefinitely, an assumption which we conclude should be revised on remand in accordance with this opinion; and (3) to the extent that the remedies require the Company to pay interest of 18 percent on its underpayments to the Union's pension and welfare funds, a rate which we conclude is not supported by the record and which may have to be revised on remand after further development of the record. Accordingly, we grant the petition for enforcement of the Board's order with these exceptions.

### III.

For the reasons stated above, we **Grant** the Board's petition for enforcement of its August 20, 1998 Order, except as follows:

1) We **Deny** enforcement insofar as the Order requires the Company to reinstate its potato-packaging operation and to re-

hire the 22 employees who used to operate the potato-packaging machine, and REMAND to the Board with instructions to arrive at a remedy that will effectuate the general reparative policies of the Act by making the employees whole without imposing an undue burden on the employer;

2) We DENY enforcement insofar as the Order requires the Company to pay specific amounts to the pension and welfare funds, and REMAND to the Board for recalculation of these amounts consistent with this opinion; and

3) We DENY enforcement insofar as the Order requires the Company to pay 18 percent interest on the amounts owed to the pension and welfare funds, and REMAND to the Board for further development of the record on this matter.