NEWSPAPER GUILD OF NEW YORK,
LOCAL NO. 3 OF THE NEWSPAPER
GUILD, AFL-CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

and

NYP Holdings, Inc., Intervenor.

Docket No. 00–4222.

United States Court of Appeals,
Second Circuit.

Argued May 23, 2001.

Decided Aug. 10, 2001.

Hanan B. Kolko, Meyer, Suozzi, English & Klein, P.C., New York, NY (Irwin Bluestein, on the brief), for Petitioner.

David A. Seid, National Labor Relations Board, Washington, DC (David Habenstreit, Supervisory Attorney, Leonard R. Page, Acting General Counsel, John H. Ferguson, Associate General Counsel and Aileen A. Armstrong, Deputy Associate General Counsel, on the brief), for Respondent.

Elliot S. Azoff, Baker & Hostetler LLP, Washington, DC (Betty Southard Murphy and Brian S. Harvey, on the brief), for Intervenor.

Before: JACOBS and LEVAL, Circuit Judges, and MURTHA, Chief District Judge.[*]

JACOBS, Circuit Judge:

This appeal reviews an order of the National Labor Relations Board ("NLRB"), finding that two subsidiaries (of the same corporation) that successively operated the same business are neither alter egos nor a single employer.

News America Publishing Inc. ("News America"), an entity controlled by Rupert Murdoch's News Corporation, formed a subsidiary in March 1993 for the purpose of managing the then-bankrupt New York Post newspaper in order to preserve the paper as an acquisition opportunity. Under the supervision of the bankruptcy court, the subsidiary published the paper, absorbed its considerable operating losses, and renegotiated its collective bargaining agreements with all but one union. The remaining union was the Newspaper Guild of New York, Local No. 3 (the "Guild" or "Union"), which is the petitioner in this proceeding.

After certain regulatory and other hurdles were surmounted, the bankruptcy court approved an asset sale to another News America subsidiary, which was formed for the purpose of competing for the asset purchase. After the closing, the Guild called an unsuccessful strike that ended with an unconditional offer to return to work, an offer that was spurned by the Post's new owner, which discharged and refused to reinstate more than 200 of the approximately 280 striking Guild employees.

The Guild filed an unfair labor practice charge, alleging that Acquisition and Holdings violated sections 8(a)(1) and (3) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 et seq., by discriminating in regard to tenure, hire and terms of employment for employees represented by the Guild, and that the companies violated NLRA sections 8(a)(1) and (5) by refusing to meet with the Guild and bargain with it in good faith.

The NLRB ruled that the two subsidiaries were not alter egos, and therefore that the new owner of the paper had the right to hire a new work force and set new terms of employment. Inquiry on alter ego is controlled by *Goodman Piping Products, Inc. v. NLRB,* 741 F.2d 10 (2d Cir. 1984), and focuses on commonality of (i) management, (ii) business purpose, (iii) operations, (iv) equipment, (v) customers, and (vi) supervision and ownership, as well as on whether the succession of employers was motivated by anti-union sentiment. *See id.* at 11–12. Key to the NLRB's alter ego ruling was its determination that the two subsidiaries did not share the same "business purpose" because they played different transactional roles and had different financial and strategic purposes. The NLRB summarily rejected the Guild's single employer argument in a footnote.

We affirm.

## BACKGROUND

The history of the Post's successive ownerships, its bankruptcy, and its labor woes is set out in detail in the decisions of the Administrative Law Judge ("ALJ") and the NLRB. We recount only the facts that bear on the appellate questions we decide.

### A. *Ownership of the Post: Pre-1993*

News America first acquired the New York Post in 1976, but was forced to sell it

[*] The Honorable J. Garvan Murtha, Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

because News America owned New York City television station WNYW, and the cross-ownership rules of the Federal Communications Commission ("FCC") barred an owner of a major newspaper from owning a television station in the same media market.

News America sold the paper in 1988 to the New York Post Company ("Post Company"), which was run by real estate developer Peter Kalikow. The paper continued to operate with the benefit of union concessions (about 48 Guild jobs were lost), but by January 1993 the Post was losing money fast, and Kalikow, who suffered financial reverses in the early 1990s, stopped funding the operating losses and resolved to close the paper unless a buyer was found.

Over the next two months, two potential purchasers of the Post surfaced: Steven Hoffenberg and Abraham Hirschfeld. Hoffenberg took over management of the Post while he arranged to buy it. When his attempt failed, Hirshfeld tried, but he too was incapable of managing the business. During this time, no one was funding the Post's mounting losses.

## B. *Financial Condition: Early 1993*

In early 1993, Hoffenberg and Hirschfeld abandoned their efforts to purchase the paper. The paper was then losing money at an average rate of $300,000 a week. On March 15, 1993, Post Company filed for protection under Chapter 11 of the bankruptcy code. It was clear that without an immediate infusion of capital, the paper--which had over 700 employees--would have to suspend publication. Given the competitive nature of the business, it was also clear that a suspension of more than a few days would be fatal.

## C. *Acquisition's Management*

Shortly after the filing in bankruptcy, Post Company vice-president Peter Faris contacted the president of News America, Patrick Purcell, to see if News America was interested in re-acquiring the paper. (Purcell had been the Post's publisher when News America owned it.) News America was potentially interested, depending on whether three conditions could be satisfied: FCC waiver of its cross-ownership rules; the implementation of operating economies to make the paper financially viable; and approval by the bankruptcy court.

On March 25, News America incorporated a subsidiary--NYP Acquisition Corp. ("Acquisition")--to manage the paper and to provide financing to the debtor in possession (Post Company) pending a possible purchase by News America or some other company (subject of course to bankruptcy court approval). Acquisition's chairman was Rupert Murdoch, and its president was Patrick Purcell; among its board members were other board members of News America.

On March 28, Acquisition asked the bankruptcy court to approve documents under which it would manage and finance the Post, with any profit going to the debtor's estate. The court granted approval the next day, and Acquisition began exercising editorial, administrative and financial control over the paper. All employees, including Guild members, continued to work under their existing collective bargaining agreements.

## D. *Bargaining with the Unions*

Early in the bankruptcy proceedings, News America made clear that it would not acquire the paper unless significant concessions were extracted from all the unions of the paper's employees. Soon after Acquisition assumed control of the

Post, News America opened negotiations for new contracts with the eleven employees' unions. After unproductive negotiations, the Post suspended publication for two days in July, but negotiations resumed after intervention by elected officials, and News America quickly reached agreements in principle with all the unions except the Guild.

News America's negotiations with the Guild came to impasse on News America's demands that (i) the Guild agree to a probationary period during which management could evaluate and terminate any Guild member without severance pay or recourse to the grievance procedures and (ii) the Guild accept the disclaimer of approximately $7 million in severance obligations undertaken by the paper's previous owners. In at least 15 sessions from May through September, the parties bargained without reaching agreement.

### E. Purchase of the Post by Holdings

Meanwhile, on June 29, the FCC granted the waiver of its cross-ownership rules-- one of the conditions for News America's eventual purchase of the paper.[1] News America was disinclined, however, to use Acquisition as the vehicle for purchasing the paper, because Acquisition, as manager of a bankrupt entity, was obliged to render financial reports to third parties, including the creditors' committee. News America determined that any purchase of the Post should be made by an entity whose records were not subject to scrutiny by third parties. For that reason, on July 12, News America incorporated another subsidiary--NYP Holdings, Inc. ("Holdings")--as the prospective purchaser. The officers and directors of the two subsidiaries were essentially the same. The corpo-

rate names can be confusing: Holdings did the acquisition of the Post; Acquisition did the holding, as its caretaker.

Holdings and Post Company negotiated an asset purchase agreement by which Holdings would acquire certain assets and take on certain liabilities of Post Company. On August 6, a motion was made for bankruptcy court approval of the asset purchase agreement; the agreement was approved on September 14.

### F. Labor Strife

The Guild announced a strike deadline of September 27 at 4:00 p.m. Fruitless negotiations between News America and the Guild continued into the morning of the 27th. News America advised the Guild that Holdings would not go through with the acquisition if publication was interrupted by a Guild strike.

The strike started on schedule on September 27th, and the other unions honored the picket line. No Post was published on September 28 and 29.

In the afternoon of September 29, the leaders of other Post unions asked the Guild's chief negotiator to persuade the striking Guild members to return to work. This effort was unsuccessful. They then turned to Purcell and asked if Holdings would go forward with its purchase of the paper if all of the unions returned to work except the Guild. Purcell agreed; the ten other unions returned to work; and the Post resumed publication on September 30.

Holdings executed the asset purchase agreement on October 1. New collective bargaining agreements were signed with all of the unions except for the Guild, and the members of those union were rehired

**1.** For discussion of the Post's condition in bankruptcy, see *Metropolitan Council of NAACP Branches v. FCC,* 46 F.3d 1154, 1156- 59 (D.C.Cir.1995) (sustaining FCC's June 29, 1993 waiver of its cross-ownership rule allowing Murdoch to purchase the Post).

without having to reapply for their positions.

On October 4, the Guild relented, and made an unconditional offer to return to work on behalf of all the striking Guild employees. Holdings required the Guild employees to fill out employment applications, and ultimately rehired fewer than half of them. Holdings has not recognized or bargained with the Guild since October 1, 1997.

### G. *Proceedings Before the ALJ and the NLRB*

On November 1, 1993, the Guild filed an unfair labor practice charge with the NLRB; an amended charge was filed on February 14, 1994. On June 9, 1995, the NLRB's General Counsel filed a complaint and notice of hearing alleging, in relevant part, that Acquisition was a successor employer to Post Company, and that Acquisition and Holdings were alter egos and constituted a single employer within the meaning of the NLRA.

After several days of hearings, ALJ MacDonald ruled that Acquisition was not a "legal successor" to the Post Company (and therefore had no duty to bargain with the unions), because during the time Acquisition managed and financed the Post, there was no contract for Acquisition to purchase the assets of the Post, and Acquisition had no duty to purchase the paper.

Judge MacDonald noted that "there is no dispute" that *Holdings* was a successor to the Post Company, but she held, under *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), that Holdings had the right to announce that it was hiring employees under different terms and conditions from those of the Post Company. Judge MacDonald did not reach the single employer issue, but did find that Holdings and Acquisition were alter egos: "[t]here

can be no dispute that Acquisition and Holdings had substantially identical management, business purpose, operation, equipment, customers, supervision and ownership." But having found that Acquisition did not succeed to the Post's obligations in the first place, Holdings could not have any duty to bargain deriving from its status as Acquisition's alter ego. Accordingly, the complaint was dismissed.

The NLRB reached the same result as the ALJ, but did so on different grounds. The NLRB assumed *arguendo* that Acquisition was the successor to the Post Company, but held that Acquisition and Holdings were not alter egos, so that any obligation to bargain on the part of Acquisition did not devolve upon Holdings.

The NLRB's alter ego analysis rested on its ruling that Acquisition and Holdings possessed distinct "business purpose[s]"--one of the criteria courts use to evaluate alter ego status. *Goodman Piping Prods., Inc. v. NLRB*, 741 F.2d 10, 11 (2d Cir. 1984). The Board reasoned that Acquisition's "primary role was to serve as a manager of the [Post's] operations in an attempt to preserve assets by keeping the operation viable." It emphasized the Post's shaky financial condition, in which context "[t]here was [ ] considerable uncertainty ... over whether Murdoch would ever purchase the paper."

The NLRB contrasted the limited role of Acquisition--as a caretaker, controlled by the bankruptcy court, and without the ability to realize profit--with Holding's role as outright owner of the paper's assets. "In sum," the Board concluded, "the difference between Acquisition and Holdings is the difference between (1) a company with an interim and limited purpose, and (2) a finalized buyer with a normal commercial purpose."

Finally, the Board noted that "there is no allegation or evidence that Holdings and Acquisition were created with an anti-union motive," another factor supporting its ruling that Acquisition and Holdings were not alter egos.

Board member Fox, in dissent, argued that Acquisition and Holdings must be deemed alter egos because their business purpose was identical, *i.e.*, running a newspaper. But the Board majority dismissed that analysis as "overly simplistic." If "business purpose" were evaluated so broadly, the Board reasoned, the word "purpose" would lack any incremental meaning, because all successor entities engaged in the same general "business" would be treated as alter egos (depending on the other relevant factors as well). The Board conceded that in the "usual case," business purpose is similar to business operation, but stated that "the instant case is clearly not the usual case."

The dissenter emphasized that Holdings and Acquisition are "wholly owned subsidiar[ies] of the Murdoch empire with substantially the same ownership, management, business purpose, operation, equipment, supervision and customers"; that they "had an identical business purpose: to publish the New York Post"; and that "for purposes of alter ego analysis, the Board has consistently regarded an employer's business purpose as being the production or provision of the products or services which the employer is in business to produce or provide."

As for the majority's distinction between "business" and "business purpose," Board member Fox suggested that there is "no authority for the novel proposition that having a business purpose to operate the New York Post and having a business purpose to own and operate the New York Post constitute separate business purposes for purpose of alter ego analysis." Even absent a common business purpose, she would have found alter ego status based on the two entities' common ownership, management, operations, equipment, customers and supervision.

\* \* \* \* \* \*

The Guild does not contest on appeal the Board's ruling that Holdings is not a legal successor to Acquisition under the test set forth in *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). The only issues before us are the Board's determinations (1) that Holdings is not an alter ego of Acquisition and (2) that Acquisition and Holdings do not constitute a single employer.

## DISCUSSION

The Guild argues that the NLRB based its alter ego analysis on a misapplication of the "business purpose" factor that is irreconcilable with prior NLRB cases.

The Guild further argues that it was error, in any event, for the Board to rely on the business purpose factor--however construed--in isolation, and to ignore the other alter ego factors set forth in *Goodman Piping*, no one of which should control.

We consider the alter ego doctrine first, then the single employer doctrine.

### I.

■ "The focus of the alter ego doctrine ... is on the existence of a disguised continuance or an [employer's] attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations." *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 748 (2d Cir.1996) (internal quotation marks and citation omitted). An employer found to be the alter ego of another is

automatically responsible for the other's legal and contractual obligations under the labor laws. *See id.*

 In determining whether two entities constitute alter egos, "a number of factors are recognized as key: whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Goodman Piping,* 741 F.2d at 11. Also considered is evidence of anti-union motive. *See id.* at 12. The test of alter ego is "flexible." *Id.* at 11. In determining whether two firms are alter egos, the Board must "weigh the circumstances of each individual case." *Id.*

### A. Business Purpose

 The NLRB ruled (1) that "business purpose" under *Goodman Piping* is a factor that may take into account the financial and strategic purposes of the relevant entities, and (2) that (so considered) Acquisition and Holdings differ in their business purposes notwithstanding the salient facts that they have the same management and produced the same product. The first ruling is one of law, the second is one of fact.

### 1. The Attributes of "Business Purpose"

 In determining that Holdings and Acquisition were not alter egos, the NLRB focused chiefly on the companies' strategic business goals (which differed) rather than on the nature of the industrial operation (which was very similar). The NLRB expressly recognized that this ruling was sufficiently unusual to require justification on the basis of unusual circumstances. In the ordinary case, two entities have the same "business purpose" if they deal in the same product or service. *See, e.g., A & P Brush Mfg. Corp.,* 323 NLRB 303, 308, 1997 WL 148696 (1997) ("the purpose of both [companies] was to manu-facture paint brushes"); *IWG, Inc.,* 322 NLRB 69, 73, 1996 WL 506089 (1996) ("[the companies] had the same business purpose ... the sale, design, installation, and service of fire sprinkler systems, primarily for commercial customers"); *Industrial TurnAround Corp.,* 321 NLRB 181, 187, 1996 WL 257140 (1996), *review denied in part, enforcement denied in part,* 115 F.3d 248 (4th Cir.1997) ("Examination of the relevant business purpose ... reveals entities engaged in exactly the same business in exactly the same market: electrical construction in Central and Southeastern Virginia."); *Hawk of Connecticut,* 319 NLRB 1213, 1223, 1995 WL 788567 (1995) ("there is no question that the nature of the business, pick up and delivery of freight, remained the same"); *Citywide Serv. Corp.,* 317 NLRB 861, 874, 1995 WL 362896 (1995) ("The business purpose and operation of the two companies was identical: they were both involved in the commercial cleaning of offices."); *Metropolitan Teletronics Corp.,* 303 NLRB 793, 798, 1991 WL 143785 (1991) ("To the extent that Capitol continued to recondition and sell telephones and related parts, just as Metropolitan did, the two businesses shared a common business purpose."); *Weinreb Management,* 292 NLRB 428, 431, 1989 WL 223770 (1989) ("Both entities have the same business purpose: to provide service and maintenance to buildings owned by the Weinreb family.").

 Relying on cases like these, the Guild argues that financial and strategic goals are immaterial as a matter of law where the two companies operate the same enterprise. We see no legal error in the Board's application of the business purpose factor. True, successor companies in paint brush manufacture will tend to share the business purpose of manufacturing paint brushes, and that purpose will tend to merge with the financial and strategic

goals of deriving profit (broadly defined) from that line of business. Thus the Board's finding of the "same business purpose" shared by two companies that manufacture paint brushes, or clean office buildings, or deliver freight, is a shorthand way of saying that the paired companies have the shared purpose of making a profit from those endeavors. It is significant that Acquisition and Holdings did not share a common purpose of earning a profit from running the newspaper: Acquisition was legally barred from earning any profits at all. Companies can of course be operated to promote business purposes other than (or in addition to) the realizing of profit from traffic in the firm's goods or services: tax losses, influence, prestige, securing of sources of supply or outlets for distribution, etc., etc. In a given case, these business goals, separately or in tandem with each other or others, may furnish grounds for distinguishing the business purposes of successor companies.

*Blazer Corp.*, 236 NLRB 103, 1978 WL 7683 (1978)—a case cited by the Board to justify its treatment of the "business purpose" factor--supports the Board's conclusion that financial and strategic goals may be considered among the attributes of a company's business purpose. In *Blazer*, the Board held that a purchaser of assets at auction in bankruptcy was not the alter ego of either the receiver or the debtor in possession, because the purchaser was running a "vital, vibrant, and growing manufacturing enterprise." *Id.* at 109. "Respondent," the Board reasoned, "has a production and maintenance work force, not merely a skeletal holding and sales cadre as did the receiver." *Id.* at 110. Similarly, Acquisition was managing a bankrupt company, with labor troubles, that was losing about $300,000 per week, and had small prospect of again becoming economically viable. As of Holdings' acquisition of the Post's assets, however, the paper's labor contracts had been largely renegotiated, and it had become part of a well-capitalized media empire.

The Guild argues that *Blazer* is inapposite because in that case the purchaser began operations over a year after the debtor in possession relinquished control to the receiver. But although particular facts differ, the essential circumstances are the same: one entity functioned to preserve the enterprise for sale, while the other became owner and proprietor with the ordinary business purpose of earning profits on goods or services. *See id.* at 110. The fact that preservation of a newspaper enterprise required continuous publication while Blazer's business could withstand a year's closing means that the entities that exercised interim control over these two businesses could take different measures to preserve them. As Holdings argues, "[t]he fact that Acquisition preserved the newspaper's viability by refusing to cease publication (thereby saving jobs) does not enlarge its limited business purpose."

The question as to which business attributes should be considered as constituting the business purpose is a question that closely touches labor policy. As News America observes, if the Guild's position were the law, News America alone of potential purchasers for the Post would be at a financial disadvantage in the bidding, because only News America would be compelled to accept as acquirer the terms of the existing collective bargaining agreements. If such a disadvantage were made to fall on the financial angel, there would be no angels, and the enterprise--and any enterprise similarly situated--would vanish, together with the jobs of its employees.

■ Thus in this case, the interest of employees generally in preserving their workplaces during periods of economic stress or bankruptcy is in some tension

with the particular interest of the Guild's leadership in repairing the effects of a miscalculation. On such questions of labor policy, we defer to the expertise of the Board. *See Auciello Iron Works, Inc. v. NLRB,* 517 U.S. 781, 787–88, 116 S.Ct. 1754, 135 L.Ed.2d 64 (1996) (holding that NLRB is due "considerable deference ... by virtue of its charge to develop national labor policy") (internal quotation marks and citation omitted). Specifically, we have deferred (at least as to fact-finding) to the NLRB's application of the *Goodman Piping* factors:

> [W]e must respect the Board's role as an agency equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. We may not displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] de novo.

*NLRB v. G & T Terminal Packaging Co.,* 246 F.3d 103, 114 (2d Cir.2001) (internal quotation marks and citation omitted). The NLRB's ruling in the present case, though unusual, does not conflict with its extensive caselaw applying the business purpose factor because, as the NLRB emphasized, "the instant case is clearly not the usual case." We cannot fault the NLRB for adopting a case-by-case, pragmatic approach that tends to preserve jobs.

### 2. *"Business Purpose" Applied*

▮▮▮▮ Having decided as a legal matter that differences in financial and strategic goals may be considered when evaluating a company's business purpose, the NLRB then made the factual finding that Acquisition and Holdings were not alter egos. Such findings are entitled to substantial deference. *See A & P Brush Mfg. Corp. v. NLRB,* 140 F.3d 216, 219 (2d Cir.1998) (question of whether one company is another's alter ego is a question of fact and "[t]he Board's factual findings will be upheld if supported by substantial evidence on the record considered as a whole").[2] A reversal based upon a factual question will be warranted only if, "after looking at the record as a whole, we are left with the impression that no rational trier of fact could reach the conclusion drawn by the Board." *G & T Terminal Packaging,* 246 F.3d at 114.

▮▮▮ We think it is quite clear that, under that standard, there is "substantial evidence" supporting the distinct business goals of the two companies. Acquisition was formed to preserve a possible opportunity for News America notwithstanding several open contingencies; Holdings was formed to take the opportunity, but only if all contingencies were satisfied. Acquisition was overseen by the bankruptcy court, and lacked power to take any major initiative in the management of the paper; Holdings was wholly in the hands of its officers and directors, who could do what they wished. Acquisition could keep no profit; Holdings can keep any profit it can earn. Acquisition owned no equipment or assets of the paper; Holdings acquired them. Acquisition could not acquire the paper because it was at an economic disadvantage relative to other potential acquir-

---

2. Substantial evidence

is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. *Id.* (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

ers, by virtue of the duties it owed to the bankruptcy court and its obligation to disclose financial data; Holdings could acquire the paper, and did.[3]

### B. *Weighting of the Business Purpose Factor*

██ The Guild argues that, regardless of whether the NLRB's interpretation of business purpose is permissible, the NLRB erred in "breach[ing] its own clear rule that no single factor is dispositive in evaluating alter ego status." Fairly read, however, the Board's decision did not focus on the business purpose factor to the exclusion of the other factors. The Board specifically reviewed other *Goodman Piping* factors. For example, the Board observed that "[t]he officers and directors of Holdings were almost identical to those of Acquisition." And, the Board recited facts that militate in favor of finding an alter ego relationship, such as Murdoch's "de facto control" over News America and its subsidiaries.

More to the point, the Board did not rest its decision entirely on its findings as to business purpose. It also found that "there is no allegation or evidence that Holdings and Acquisition were created with an antiunion motive," a finding that the Guild does not dispute. True, the NLRB recently stated that "unlawful motivation is not a necessary element of an alter ego finding ... [and] disavow[ed] the ... suggestion that the lack of an antiunion motivation 'generally militates' against finding an alter ego relationship." *Dupont Dow,* 332 NLRB No. 98 n. 1, 2000 WL 1679480 (Oct. 31, 2000). At the same time, however, "evidence of unlawful anti-

union motive in the creation of a corporation is relevant" in the alter ego analysis. *Market King, Inc.,* 282 NLRB 876, 877 n. 3, 1987 WL 90184 (1987), *superceded on other grounds by Image Sys.,* 285 NLRB 370, 1987 WL 123939 (1987).

With respect to the "management" factor under *Goodman Piping,* the NLRB observed: "[i]n contrast to Acquisition's managerial role, Holdings' role was solely that of the purchaser. That is, after Holdings was selected as the purchaser, and after it was approved by the FCC, the interim functions of Acquisition were completed." Thus although the management of Acquisition and Holdings was composed of the same people, the management of each entity exercised powers that were functionally distinct. As the management of a company in bankruptcy, Acquisition's officers required approval by the bankruptcy court for any major corporate initiative, while the management of Holdings was subject to no such constraints.

Similarly, the "operation" and "supervision" of the two entities differed in kind notwithstanding the essential identity of the people who were officers and directors. As to the entities' operation, Holdings was a going forward concern, while Acquisition was no more than a caretaker administration. A similar distinction can be drawn as to "supervision": the bankruptcy court necessarily imposed an additional supervisory layer on Acquisition. For example, without court approval, Acquisition could not alter Post Company's collective bargaining agreements, or enter into any contract longer than 30 days' duration.

\* \* \* \* \* \*

---

**3.** Record testimony also supports a finding that Holdings was incorporated with a different business purpose than Acquisition. For example, News America's Vice President and General Counsel Jan F. Constantine testified that Holdings was formed to "start from day one with independent records and independent relationships with various vendors, employees, [and] unions."

■ In sum, we find no legal error in the manner in which the Board applied the business purpose factor. And, the Board's determination that Acquisition and Holdings were not alter egos is supported by substantial evidence in the record. We need not decide whether the business purpose factor could predominate without consideration of competing factors, because the NLRB in fact weighed other factors. Indeed, while most of the other *Goodman Piping* factors favor an alter ego finding, not all do, and the circumstances presented to the NLRB in this case cast the ordinary factors in an extraordinary light.

## II

■ The Board found the single employer doctrine inapplicable because "the instant case does not involve two ongoing businesses coordinated by a common single master." The Guild argues that Acquisition and Holdings were controlled by a single employer--Rupert Murdoch's News America.

The Board reasonably declined to apply the single employer doctrine. In *Johnstown Corp.*, 322 NLRB 818, 1997 WL 5831 (1997), *on remand from Stardyne, Inc. v. NLRB*, 41 F.3d 141 (3d Cir.1994), the NLRB adopted the Third Circuit's analysis of the single employer and alter ego doctrines: "[t]he single employer doctrine generally applies where the entities *concurrently* perform the same function and one entity recognizes the union and the other does not," whereas "[t]he alter ego doctrine, by contrast, examines seven objective criteria plus intent and usually comes into play when a new legal entity has *replaced* the predecessor (or at least the unionized portion of the predecessor)." *Id.* at 152 (emphasis in original); *see Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 748 (2d Cir.1996) (noting that "the alter ego

test is notably different than ... [the] single employer test").

The single employer doctrine does not apply here, because when Holdings completed its asset purchase from the Post Company and began to operate the paper as its owner, Acquisition's managerial role on behalf of the Post Company ended. *See NLRB v. Hospital San Rafael, Inc.*, 42 F.3d 45, 50 (1st Cir.1994) (describing single employer doctrine as applying primarily "in the case of two ongoing businesses which the NLRB wishes to treat as a single employer on the ground that they are owned and operated as a single unit").

## CONCLUSION

For the foregoing reasons, we affirm the decision of the NLRB.