*NLRB v. Newark Electric*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2019

(Argued: February 11, 2020     Decided: September 17, 2021)

Docket No. 18-2784

NATIONAL LABOR RELATIONS BOARD,

*Petitioner*,

–v.–

NEWARK ELECTRIC CORPORATION, NEWARK ELECTRIC 2.0, INC.,
COLACINO INDUSTRIES, INC.,

*Respondents*.

B e f o r e :

WALKER, CARNEY, *Circuit Judges*, and KOELTL, *District Judge*.[1]

The National Labor Relations Board (the "NLRB" or the "Board") petitions for enforcement of its Decision and Order, 366 N.L.R.B. 145 (July 31, 2018), requiring Respondents Newark Electric Corporation, Newark Electric 2.0, Inc., and Colacino

[1] Judge John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

Industries, Inc. (together, the "Companies") to reinstate a former employee and to comply with their collective bargaining obligations with the International Brotherhood of Electrical Workers Local 840 ("the Union"). The Companies oppose the petition. They first challenge the basic legitimacy of the Order, arguing that it resulted from a complaint issued by an Acting General Counsel of the Board who, under the terms of the Federal Vacancies Reform Act, lacked the requisite authority. Second, the Companies assail the Order's predicate finding that Newark Electric and Colacino Industries are a single employer and alter egos. Third, they resist the Order insofar as it reinstates and awards damages to a discharged former employee of Colacino Industries. At the threshold, although we agree with the Companies that the Board's original complaint was invalid, we reject their challenge to its ratification by the NLRB's General Counsel and conclude that the Board's Order may be enforced. Next, we decide that the Board's conclusion that Newark Electric and Colacino Industries were a single employer and alter egos is supported by substantial evidence. We find unpersuasive the Companies' further argument that Colacino Industries' termination of its Letter of Assent with the Union also ended Newark Electric's obligations toward the Union. Finally, we find that substantial credible evidence supports the Board's conclusion that Colacino Industries violated section 8(a)(3) of the Act when it terminated the employee. We therefore GRANT the Board's petition for enforcement.

PETITION GRANTED.

—————

MILAKSHMI V. RAJAPAKSE (Peter B. Robb, Julie B. Broido, Alice B. Stock, David Habenstreit, *on the brief*), National Labor Relations Board, Washington, DC, *for Petitioner*.

EDWARD A. TREVVETT, Harris Beach PLLC, Pittsford, NY, *for Respondents*.

—————

CARNEY, *Circuit Judge*:

This case arises from a long-pending labor dispute between the International Brotherhood of Electrical Workers Local 840 ("the Union") and three closely related corporations doing business in Newark, New York: Newark Electric Corporation, Newark Electric 2.0, Inc. ("Newark 2.0"), and Colacino Industries, Inc. (the three

collectively, "the Companies"). The Board seeks enforcement of its Order to the Companies, premised on a finding that, for purposes of the National Labor Relations Act ("NLRA" or the "Act"), the Companies are alter egos and a single employer.[2] The Companies contest that finding as to Newark Electric and Colacino Industries.

Resolution of the dispute has been protracted in part because of concerns raised under the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345-3349d, about the lawfulness of the original complaint, which was issued in 2013 by the Board's then-Acting General Counsel, Lafe Solomon. *See NLRB v. Sw. Gen., Inc.*, 137 S. Ct. 929, 943-44 (2017) ("*Southwest General*") (holding Acting General Counsel Lafe Solomon was prohibited from serving in that position following his nomination to serve as the NLRB's General Counsel on a permanent basis). And so, relatedly, this case requires us to address the effect of the later ratification of the original complaint by a fully confirmed General Counsel. The Companies assail the ratification's effectiveness.

For the reasons set forth below, we reject the Companies' challenges and GRANT the Board's petition for enforcement.

## BACKGROUND[3]

### I. The Companies and the Letters of Assent

During the 1980s and 1990s, Newark Electric was an electrical contractor solely owned by Richard Colacino ("Richard"). In 2000, some substantial changes to Newark Electric's structure began: Richard's son James Colacino ("James") purchased Newark

---

[2] The parties stipulated that Colacino Industries and Newark 2.0 were a single employer and alter egos. J.A. 14 n.5.

[3] Unless otherwise noted, our description of the facts is drawn largely from the Administrative Law Judge's ("ALJ") decision of January 6, 2014, which is based on testimony and documentary evidence presented to him. J.A. 13-26. We note the parties' differences where relevant.

3

Electric's assets, goodwill, equipment, customer database, and website from his father, leaving the liabilities behind. James formed a new corporation, Colacino Industries, and placed in it the assets that he had purchased.

A little over a decade later, in March 2011, James formed a third company, "Newark Electric 2.0." The record suggests that at least Colacino Industries and Newark 2.0 provided some form of technical electrical contracting services during this time; the parties dispute whether Newark Electric was entirely dormant, but the record is clear that it was not dissolved. James ran the three entities from two office spaces that he owned on Harrison Street in Newark, NY. J.A. 15.

In the early 2000s, Michael Davis worked as an organizer for the Union in the same part of New York State, and in those years, he devoted time to persuading employers to sign a Letter of Assent ("LOA") with the Union as a first step toward their anticipated full participation in the Union's multi-employer collective bargaining agreement ("MCBA") with the Finger Lakes NY Chapter of the National Electrical Contractors Association (the "NECA") (an employer organization). The form of LOA then in use bound the assenting employer for 180 days to the MCBA. After the end of the 180-day trial period—and at any time in the five-month period between the 181st day and the day that is 30 days before the LOA's first anniversary—the employer may cancel the LOA by simply providing a "written 30-day notice" to the Union. J.A. 16. If that five-month period expires without delivery of such a notice, however, the employer becomes generally bound by the MCBA and may not terminate until the MCBA itself expires.

In 2005, Davis began an effort to persuade James to enroll Newark Electric and Colacino Industries in the LOA process. About six years later, the effort paid off: on February 24, 2011, James signed a Letter of Assent with the Union. (As we describe later, on exactly which company's behalf he signed the first LOA became subject to

4

dispute.) And not long after, in July 2011, James approached Davis, asking for a second LOA. On July 20, Davis and James executed the second LOA, with Davis again signing for the Union and James signing for Colacino Industries.

Both LOAs adopted the timeline that we have described: a 180-day trial period followed by a five-month cancellation period, after which the MCBA's terms governed until the MCBA's expiration. The first LOA thus set up a trial period that ran from February 24 until August 24, 2011, after which the company had until January 24, 2012, to terminate. The second LOA created a trial period running from July 20, 2011, until January 19, 2012, after which the company had until June 20, 2012, to terminate.

The relationships did not last long. By letter dated April 12, 2012, James wrote to Davis that Colacino Industries intended to terminate the second LOA effective as of May 26. Thus, under the second LOA the termination notice was timely: the deadline for terminating it was in June and the notice was delivered in April, months before.

Not long after receiving James's April letter, Davis met with various employees of the Companies to discuss their Union membership. On June 29, during one such meeting, two Colacino Industries employees handed Davis a letter written on Newark Electric letterhead advising Davis that James thereby terminated Newark 2.0's agreement with the Union, effective immediately. (Davis later testified that this was the first time he became aware of an entity called Newark Electric 2.0.)

Davis and James met a few days later, on July 2. In the meeting, James took the position that the second LOA superseded the first and governed the Union's relationship with both Newark 2.0 and Colacino Industries. The April termination notice was therefore effective for both companies, in his view. Davis countered that the Union's first LOA was with Newark Electric (not Newark 2.0) and that it was still in

5

effect; that Newark Electric had missed its January 24, 2012 deadline for terminating the first LOA; and that, accordingly, Newark Electric was still bound by the MCBA.

Thereafter, both Newark Electric and Colacino Industries refused to comply with the MCBA. A few months later, in September 2012, James dissolved Newark 2.0, and in 2013, Richard dissolved Newark Electric. After 2013, only Colacino Industries survived in corporate form.

After the Union filed a complaint with the Board in 2012, on May 30, 2013, the Board filed a complaint against all three Companies. Two years later, in May 2015, the applicable MCBA expired, opening a window for the surviving Colacino Industries to terminate its relationship with the Union by giving written notice no less than 100 days before the expiration date, no matter the ultimate effect of their earlier termination efforts.

## II. Anthony Blondell's Discharge from Newark Electric

Anthony Blondell was an electrician and longstanding Union member who began working for Newark Electric in March 2011, after James signed the first LOA. In July 2012, when James and Davis were sparring over the status of the LOAs, James discharged Blondell. The circumstances of the discharge are disputed. But, the record is clear that as the July 20 end date for the second LOA approached, James told Blondell that he planned to cease being a union employer. J.A. 23. On July 20, James gave Blondell a termination letter advising that Colacino Industries was "lay[ing] [Blondell] off" for "lack of work." J.A. 333.

## III. Procedural History

On May 30, 2013, Lafe E. Solomon, then the Board's Acting General Counsel, issued a complaint charging the Companies with various unfair labor practices. Following a lengthy hearing, an ALJ found that the Companies violated sections 8(a)(5)

6

and (1) of the Act by repudiating and failing to comply with the two LOAs and the MCBA. The ALJ also ruled that the Companies violated sections 8(a)(3) and (1) of the Act when they unlawfully terminated Blondell's employment based on anti-union animus.

Almost two years later, in March 2015, the Board affirmed the ALJ's judgment, with minor revisions, 362 N.L.R.B. 44 (2015), and the Companies appealed the decision to the U.S. Court of Appeals for the District of Columbia Circuit. In July 2017, that court vacated the Board's decision and remanded for further proceedings in light of the Supreme Court's then-recent decision in *Southwest General*. *See* Order, *Newark Elec. Corp. v. NLRB*, No. 15-1111, 2017 WL 5662145 (D.C. Cir. July 14, 2017). As described above, the Supreme Court ruled in that case that the Board's Acting General Counsel was prohibited from issuing complaints because his continued service as Acting General Counsel after January 5, 2011, violated the FVRA. *Southwest General.*, 137 S. Ct. at 937, 943-44.

One month later, in August 2017, Board General Counsel Richard F. Griffin, Jr., who was duly appointed by the President and confirmed by the Senate, formally ratified the 2013 complaint. J.A. 30, 34-41. The Board then affirmed its earlier rulings, stating that it had given de novo consideration to the prior proceedings and the parties' updated submissions. 366 N.L.R.B. 145 (2018). It then petitioned this Court for enforcement of its Order.[4] *See* 29 U.S.C. § 160(e). It is that petition that is before us now.

---

[4] The Board's Order requires the Companies (1) to cease and desist from the unfair labor practices found by the Board, (2) to give full force and effect to the terms and conditions of employment in the collective bargaining agreement, (3) to make employees whole for the Companies' failure to honor the terms of the collective bargaining agreement, (4) to offer Blondell full reinstatement to his former job or the equivalent; make him whole for any loss of earnings and other benefits suffered as a result of his unlawful discharge, and (5) to post a remedial notice. J.A. 7-8.

**DISCUSSION**

We examine the Board's findings of fact to determine whether they are supported by substantial evidence. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488-89 (1951); *NLRB v. Pier Sixty, LLC*, 855 F.3d 115, 121 (2d Cir. 2017), *as amended* (May 9, 2017). "Substantial evidence is more than a mere scintilla." *NLRB. v. Long Island Ass'n for Aids Care, Inc.*, 870 F.3d 82, 87 (2d Cir. 2017).[5] "The substantial evidence standard requires us to review the record in its entirety, including the body of evidence opposed to the NLRB's view. We may not, however, displace the NLRB's choice between two fairly conflicting views, even though we would justifiably have made a different choice had the matter been before us de novo." *Id.*

We review the NLRB's legal conclusions *de novo. Pier Sixty, LLC*, 855 F.3d at 122. We give "considerable deference," however, to "legal conclusions based upon the Board's expertise." *Id.*; *see also NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 89-90 (1995).

### I. The General Counsel's Ratification of the Complaint Was Effective

The Companies advance three separate challenges to the Board's proceedings on the complaint ratified by the General Counsel. First, they argue that the proceedings are void altogether: because the Acting General Counsel was acting without authority under the FVRA when he filed the first complaint, they maintain that all subsequent proceedings are a nullity. Second, they urge that the General Counsel's ratification of the first complaint was invalid in and of itself because certain "boilerplate" language that appears in a series of ratification notices that he issued reflects that he had less than

---

[5] Unless otherwise noted, in quotations from case law, this Opinion omits all alterations, brackets, citations, emphases, and internal quotation marks.

the "full knowledge" of relevant facts that is necessary for a valid ratification. Respondents' Br. 23-24. Finally, they identify a due process violation in the Board's decision on remand to adopt the 2015 decision in full without giving the Companies a chance to fully re-litigate the issues. We address each of these arguments in turn.[6]

### A. FVRA Challenge

The FVRA is codified in 5 U.S.C. §§ 3345-3349d. Section 3345(a) empowers the President to name an acting official to an office for which a permanent appointment requires Senate confirmation. *Id.* § 3345(a)(1)-(3).[7] The universe of persons eligible to serve in an acting capacity is limited, however, by the categories enumerated in section 3345(a). *See Southwest General*, 137 S. Ct. at 936 ("Section 3345(a) of the FVRA permits three categories of Government officials to perform acting service in a vacant PAS office [that is, one for which a Presidential appointment and Senate confirmation are required]."). The pool of possible acting officials is additionally limited by subsection (b)(1) of section 3345, which provides in relevant part that "a person may not serve as an acting officer for an office under this section, if . . . the President submits a nomination of such person to the Senate for appointment to such office." *Id.* § 3345(b)(1)(B).

---

[6] The Companies also briefly argue that, by allowing the President to appoint "Principal Officers" without the advice and consent of the Senate, the FVRA violates the Constitution's Appointments Clause. *See* Respondents' Br. 21-22 (citing *Southwest General*, 137 S. Ct. at 946 (Thomas, *J.*, concurring)). Because we conclude that the General Counsel lawfully ratified the original complaint, we have no need to address this argument.

[7] Lafe E. Solomon, the official whose action here was challenged, was named Acting General Counsel of the NLRB under subsection (a)(3) of § 3345. *See Southwest General*, 137 S. Ct. at 937 ("Solomon satisfied the requirements for acting service under subsection (a)(3) of the FVRA because he had spent the previous ten years in the senior position of Director of the NLRB's Office of Representation Appeals."). The other categories of eligible officials are not at issue here.

The FVRA also sets a time limit for acting officers: those serving in that capacity under § 3345 may do so for "no longer than 210 days beginning on the date the vacancy occurs." *Id.* § 3346(a)(1). Section 3347 of the FVRA makes sections 3345 and 3346 the "exclusive means for temporarily authorizing an acting official," unless another statutory provision authorizes otherwise, or a recess appointment is made. *Id.* § 3347(a)(1)-(2).

Section 3348 provides broadly that "[a]n action taken by any person who is not acting under section 3345, 3346, or 3347 . . .  in the performance of any function or duty of a vacant office . . . shall have no force or effect." *Id.* § 3348(d)(1). Additionally, it establishes that "[a]n action that has no force or effect . . . may not be ratified." *Id.* § 3348(d)(2). In other words, under section 3348, if an official who is exercising the duties of a vacant office in an acting capacity does not meet the requirements of sections 3345, 3346, or 3347, then that official's actions have no force or effect and cannot be ratified.

Critically here, section 3348 expressly exempts from its purview actions taken by the General Counsel of the National Labor Relations Board.[8] The existence of this explicit exemption implies strongly that, with regard to actions taken by *that* official, the converse of the "no force and effect" provision will hold: actions taken by an Acting General Counsel of the Board are *not* automatically void and *may* be ratified by a lawfully appointed acting official, even if the actions were not authorized when first taken. *Cf. Sw. Gen., Inc. v. NLRB*, 796 F.3d 67, 79 (D.C. Cir. 2015) (assuming without deciding that "section 3348(e)(1) renders the actions of an improperly serving Acting General Counsel *voidable*, not void"); *Southwest General*, 137 S. Ct. at 938 n.2 (declining to

---

[8] Section 3348(e)(1) provides in relevant part: "This section shall not apply to – (1) the General Counsel of the National Labor Relations Board." 5 U.S.C. § 3348(e)(1).

reach issue). We thus read the text of the statute to foreclose the Companies' argument that the Acting General Counsel's complaint was void at the inception and not amenable to ratification.

The parties do not dispute that, under *Southwest General*, Solomon's 2010 appointment as an acting officer under section 3354(b)(1) became invalid in January 2011, when he was formally nominated to serve as the General Counsel by then-President Obama. The Board issued its Complaint against the Companies on May 30, 2013, well after Solomon's nomination to serve as permanent General Counsel in January 2011, but before General Counsel Griffin was confirmed in November 2013. The Complaint was therefore issued after Solomon's authority to act as Acting General Counsel ceased, and under the FVRA, it is void unless it was subsequently ratified by a lawfully serving official. *See* 5 U.S.C. § 3348(e)(1) (discussed above).

The parties also accept that General Counsel Griffin was validly appointed and confirmed by the Senate on November 4, 2013. He issued a "Notice of Ratification" with regard to the 2013 Complaint against the Companies on August 14, 2017. The question before us, then, is whether General Counsel Griffin's ratification of the Complaint was valid. We conclude that it was.

Our Court has not yet had occasion to pass on the issue of a duly appointed official's ratification of the actions of an acting official. In *Federal Election Commission v. NRA Political Victory Fund*, 513 U.S. 88 (1994), however, the Supreme Court reasoned that general principles of agency law, "and in particular the doctrine of ratification," apply when dealing with ratification of agency action within the executive branch—in that case, the Solicitor General's authority to ratify a petition for certiorari filed by the Federal Election Commission. *Id.* at 98. The Supreme Court held in that case that, consistent with principles of agency law, for its ratification to be effective, the ratifying

party had to possess the authority himself to do the ratified act "at the time the ratification was made." *Id.*

Adhering to this instruction, the D.C. Circuit has upheld agency ratifications in circumstances similar to those before us here. After the Supreme Court disallowed recess appointments to the Board in *NLRB v. Noel Canning*, 573 U.S. 513, 519-20 (2014), the D.C. Circuit upheld ratifications of the recess-appointed Board's actions by the properly constituted Board. *See Wilkes-Barre Hosp. Co. v. NLRB*, 857 F.3d 364, 371 (D.C. Cir. 2017). The D.C. Circuit's precedents "establish[ed] that ratification can remedy a defect arising from the decision of an improperly appointed official . . . when . . . . a properly appointed official has the power to conduct an independent evaluation of the merits and does so." *Id.*; *see also Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 117-21, 124 (D.C. Cir. 2015). Valid ratification, in the view of the D.C. Circuit, required the Board to "conduct an independent evaluation of the merits," and make "a detached and considered judgment." *Wilkes-Barre Hosp.*, 857 F.3d at 371-72. Finding no evidence that the Board failed to do so, the D.C. Circuit held that "the properly constituted Board's ratification remedied any defect" arising from the lack of a quorum of Board members. *Id.* at 371.

The Third Circuit reached a similar conclusion in *Advanced Disposal Services East, Inc. v. NLRB*, 820 F.3d 592 (3d Cir. 2016). It described the requisite process, derived from earlier case law dealing with a principal's later ratification of an agent's actions:

> First, the ratifier must, at the time of ratification, still have the authority to take the action to be ratified. Second, the ratifier must have full knowledge of the decision to be ratified. Third, the ratifier must make a detached and considered affirmation of the earlier decision. These last two requirements are intended to ensure that the ratifier does not blindly affirm the earlier decision without due consideration.

*Id.* at 602-03.

12

We have recognized similar principles of agency law governing the ratification of an agent's acts by a principal. *See, e.g.*, *Monarch Ins. Co. of Ohio v. Ins. Corp. of Ireland*, 835 F.2d 32, 36 (2d Cir. 1987) ("Ratification requires acceptance by the principal of the benefits of an agent's acts, with full knowledge of the facts, in circumstances indicating an intention to adopt the unauthorized arrangement."); *Breen Air Freight, Ltd. v. Air Cargo, Inc.*, 470 F.2d 767, 773 (2d Cir. 1972) ("Under the law of agency[,] ratification can only occur when the principal, having knowledge of the material facts involved in a transaction, evidences an intention to ratify it.").

Following the Supreme Court's instructions in *NRA Political Victory Fund* and our own case law, we apply the same principles now to the Board General Counsel's ratification of an Acting General Counsel's earlier-filed complaint. Valid ratification occurs, therefore, when the General Counsel, possessing the authority necessary to undertake the ratified act at the time of ratification, *see NRA Political Victory Fund*, 513 U.S. at 98, and with full knowledge of the material facts, *see Monarch Ins. Co.*, 835 F.2d at 36, manifests an intent to ratify the act in question. *See generally* Restatement (Third) of Agency § 4.01 (2006) (defining "Ratification").

We therefore decide that agency actions can be ratified, so long as the actions of the agency official that are being ratified are not automatically void under the FVRA. *See* 5 U.S.C. § 3348. If an action is merely voidable, and not void, that action can be ratified by a properly serving official who (1) has authority to take the action, and (2) with full knowledge of the underlying matter, (3) makes an independent and detached evaluation of the merits. *See Wilkes-Barre Hosp. Co.*, 857 F.3d at 371; *Advanced Disposal Servs. E., Inc.*, 820 F.3d at 602-03. In reaching this conclusion, we join the D.C. and Third Circuits, which have upheld ratifications made by General Counsel Griffin after the Supreme Court's decision in *Southwest General*. *See Midwest Terminals of Toledo Int'l, Inc.*

13

*v. NLRB*, 783 F. App'x 1, 6-7 (D.C. Cir. 2019); *1621 Route 22 W. Operating Co. v. NLRB*, 725 F. App'x 129, 137 (3d Cir. 2018) (non-precedential).

B.      Challenge to General Counsel Griffin's ratification

The Companies maintain that General Counsel Griffin's ratification was nevertheless invalid because his order affirming the prior complaint used language that they view as "boilerplate" and as indicating something less than "full knowledge" of the facts. Respondents' Br. 23-24. Because General Counsel Griffin used the same language in many ratifications, they argue, he must not have had full knowledge of this proceeding.

This argument is unpersuasive. Unless the record includes clear evidence to the contrary, agency action is entitled to a presumption of regularity. *See Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004). We thus presume the agency has considered all the evidence and properly discharged its duties. *Id.*; *see also J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 394 n.7 (2d Cir. 2000) ("Absent a showing to the contrary, it is presumed the agency considered all evidence in the record when making its determination."). Absent additional record evidence, the Companies' conclusory claims that the use of "boilerplate language" shows less than "full knowledge of the underlying facts" is not sufficient to overcome the presumption that the ratifying official has considered the relevant evidence. Respondents' Br. 24; *see also Wilkes-Barre Hosp. Co.*, 857 F.3d at 372 (absent evidence suggesting a failure to make a detached and considered judgment, "the better course is to take [the] ratification at face value and treat it as an adequate remedy"). Therefore, we conclude that the General Counsel's ratification was valid.

14

C.      Due Process challenge

Finally, the Companies assert that on remand from the D.C. Circuit, the Board violated their due process rights by not affording them an opportunity to present new legal arguments about laches, in conflict with the invitation extended by the D.C. Circuit in its remand order.[9] Respondents' Br. 25-26. But on remand, the NLRB asked each party for position statements, and the Companies submitted a merits position statement that addressed laches. J.A. 34-41. The Companies persist, nevertheless arguing that the position statements were not sufficient to permit the Board to adjudicate their laches arguments "*fully* and *fairly*." Respondents' Br. 27.

To prevail on such a claim in the context of agency proceedings, the Companies must show "some violation of established law or procedures or that [they were] specifically prejudiced"; we have held that "an element of confusion or novelty *alone* does not violate due process." *NLRB v. Washington Heights-W. Harlem-Inwood Mental Health Council, Inc.*, 897 F.2d 1238, 1244 (2d Cir. 1990) (emphasis added). Agency regulations contemplate requests for position statements after remand. *See* 29 C.F.R. § 102.46(i)(2) ("Where a case has been remanded by the court of appeals, the motion [to file an amicus curiae brief] must be filed no later than 21 days after the parties file statements of position on remand."). The letter that the Board sent to the Companies and the General Counsel after remand stated that statements of position would be subject to section 102.46(h), the regulatory provision that governs page limits and other requirements for principal briefs filed before the Board. J.A. 28 (citing 29 C.F.R. § 102.46(h)). That the Board rejected Respondents' laches argument on remand hardly

---

[9] *See* Order, *Newark Electric Corp. v. NLRB*, No. 15-1111, 2017 WL 5662145, at *1 (D.C. Cir. July 14, 2017) ( "Petitioners may raise their laches argument on remand and seek judicial review if unsatisfied with the result.").

15

establishes a due process violation. Again, we apply the presumption of regularity: the argument was made, and the Board simply did not accept it.

In sum, we identify no violation of established law or procedure in the agency proceedings on remand nor any prejudice accruing to the Companies by the agency's acceptance of position statements instead of completely new briefing.

## II. The Board's Conclusions of Fact and Law

### A. The Companies are a single employer and alter egos

Whether two corporations are a single employer or alter egos for purposes of labor law presents a question of fact. *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 747 (2d Cir. 1996). We review the Board's factual findings to determine whether they are supported by substantial evidence. 29 U.S.C. § 160(e).

The Board concluded that the three Companies were a single employer and alter egos of one another.[10] Although closely related, the single-employer and alter-ego doctrines differ slightly. The single employer doctrine applies to determine whether two concurrently ongoing businesses "are part of a single integrated enterprise" and therefore should be treated as one for purposes of the Act. *Lihli Fashions Corp.*, 80 F.3d at 747. The Board focuses on four factors in making this determination: "interrelation of operations, common management, centralized control of labor relations and common ownership." *Id.* "[N]ot every factor need be present," however, to support a finding of single employer status, and "no particular factor is controlling." *Id.* "When two entities are found to be a single employer, one entity's collective bargaining agreement covers the other entity as well, provided that the two entities' employees constitute a single

---

[10] In the ALJ's precise words, "Based on its operations described above and the parties' stipulation, Respondent Newark Electric, Respondent Newark Electric 2.0, and Respondent Colacino Industries constitute a single-integrated business and have been at all material times alter egos and a single employer within the meaning of the Act." J.A. 24.

appropriate bargaining unit." *Id.* at 748 (quoting *Stardyne, Inc. v. NLRB*, 41 F.3d 141, 144 (3d Cir. 1994)).[11]

The alter ego doctrine, if applicable, "has the same binding effect" as the single employer doctrine, but it is "conceptually distinct." *Id.* The focus of the alter ego inquiry is on whether there has been an "attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations." *Id.*[12] When considering whether two employers are alter egos, therefore, the Board considers the four factors relevant to the single employer doctrine described above, and in addition asks "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Goodman Piping Prods., Inc. v. NLRB*, 741 F.2d 10, 11 (2d Cir. 1984). A finding of anti-union motivation is not necessary to conclude that two entities are alter egos, but it may be "germane." *Id.* at 12; *see also NLRB v. G & T Terminal Packaging Co.*, 246 F.3d 103, 118 (2d Cir. 2001).

Under our circuit's precedent, "[a]n employer found to be the alter ego of another is automatically responsible for the other's legal and contractual obligations under the labor laws." *Newspaper Guild of N.Y., Local No. 3 of Newspaper Guild v. NLRB*, 261 F.3d 291, 298-99 (2d Cir. 2001). Thus, "[a]lter egos are bound by each other's collective bargaining agreements." *G & T Terminal Packaging Co.*, 246 F.3d at 118.

---

[11] Respondents did not argue that the employees of Newark Electric and Colacino Industries did not constitute a single appropriate bargaining unit, therefore this aspect of the single employer doctrine is not at issue. *See* Respondents' Br. 28-31.

[12] *See also* 9 Emp. Coord. Labor Relations § 4:8 ("The alter ego theory was developed by the NLRB to prevent employers from evading labor obligations by restructuring. . . . [It] also is used to prevent entities from using 'double-breasted' operations, the term used to describe commonly owned unionized and nonunion firms.").

The tests relevant to application of both the single employer and alter ego doctrines are easily satisfied here. As the ALJ determined, between 2000 and 2012, James operated Newark Electric and Colacino Industries interchangeably, using both names in commercial dealings with customers and the public. J.A. 17, 20. All three Companies shared the same office space, phone system, copiers, and email mailbox. The Newark Electric and Colacino Industries logos were both displayed on the shared office, stationery, employee timesheets, and job cards. Employees of all three companies serviced the same customers and used the same warehouse for supplies. James managed the employees and made personnel decisions for all three companies, and the payroll reports for the employees and the Union contributions and deductions listed all three Companies.

The Companies also had common, although not completely coextensive, ownership. James owned 100 percent of Colacino Industries and Newark 2.0, as well as Newark Electric's assets, customer base, goodwill, and logo, while his father, Richard, retained responsibility for Newark Electric's earlier debts. Further, the ALJ determined that, even if Richard retained formal ownership of Newark Electric until it was dissolved in 2013, "the active control of both companies was in the hands of James Colacino." J.A. 20 n.11. Thus, the Board's determination that Newark Electric and Colacino Industries are a single employer and also alter egos was supported by substantial evidence.

The Companies assail that conclusion, contending that the Board misapplied the alter ego doctrine. Newark Electric was not operational during the relevant time period, they allege. Rather, they say it had been "completely dormant since 2000." Respondents' Br. 29. They deny any overlap in the management or ownership of the Companies: "While James Colacino worked for Richard Colacino at NEC [that is, Newark Electric] prior to forming his own company and Richard Colacino works for

18

James Colacino at Colacino Industries, neither ever had any ownership or management role in the other's company." Respondents' Br. 31. Therefore, they say, the Companies cannot be alter egos.

This argument is unavailing. First, common ownership is not the only factor relevant to determining alter ego status; no single factor is controlling. *See A & P Brush Mfg. Corp. v. NLRB*, 140 F.3d 216, 219 (2d Cir. 1998). Second, the Board determined based on record evidence that Newark Electric was not "dormant" after 2000, but rather that it "was holding itself out to the public as an active operating company from the years 2000 to 2012." J.A. 15. Newark Electric continued to make employee contributions to the Union in its own name after James signed the first LOA. During that time, the Board determined, James maintained "active control" over both Newark Electric and Colacino Industries, even if formal ownership of Newark Electric remained with Richard. J.A. 20 n.11. This finding, too, is supported by substantial evidence, and satisfies the element of common ownership underpinning the Board's determination that the Companies were a single employer or alter egos during the relevant period. *See Kenmore Contracting Co.*, 289 NLRB 336, 337 (1998). We thus conclude that the record supports the Board's alter ego determination.

B.    <u>As a matter of law, the second LOA did not supersede or merge with the first</u>

The Companies next assert that, if they are single employers and alter egos, contract principles should relieve them of liability for failing to bargain with the Union because the second LOA "merged with and superseded" the first. Respondents' Br. 32. According to the Companies, if Colacino Industries is correctly treated as a single entity with and an alter ego of Newark Electric for the purpose of binding it to the first LOA, then the two must also be treated as a single entity for the purpose of extinguishing the relationship with the Union through Colacino Industries' cancellation of the second

19

LOA. Respondents' Br. 32-33. The argument has some force, but in the end, we are constrained to disagree.

Under New York's common-law doctrine of contract merger,[13] when parties who have entered first into one agreement subsequently enter into a second regarding the same subject matter, the first agreement "merges" with the second, and the terms of the second agreement control: "It is famil[i]ar law, of course, that upon the execution of a valid substituted agreement, the original agreement merges with it and is extinguished." *Shubin v. Surchin*, 280 N.Y.S.2d 55, 59 (App. Div. 1st Dep't 1967); *see also Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011) ("Under New York law . . . a subsequent contract regarding the same matter will supersede the prior contract.").

The two LOAs at issue here concern the same subject matter: an agreement to become a union employer subject to the master collective bargaining agreement between the Union and NECA. *See* J.A. 253-55; 273-75. But the doctrine of merger just described applies only when two successive agreements governing the same subject matter are entered into by identical parties. *See Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 524 (E.D.N.Y. 2017) (applying New York law) ("It is a well settled principle of contract law that a new agreement between the same parties on the same subject matter

---

[13] The Companies cite no case to support their contention that "if Colacino Industries is to be treated as a single entity with and alter ego of NEC for the purpose of binding it by NEC's agreement with the Union, it must also be treated as a single entity for the purpose of extinguishing its relationship and agreement with the Union." Respondents' Br. 32-33; *see also* Respondents' Reply Br. 7-9. They point to two decisions that they claim are "not to the contrary," Respondent's Br. 33, but these decisions straightforwardly apply the alter ego doctrine to find the alter ego companies liable for the unfair labor practices identified. *Concourse Nursing Home*, 328 N.L.R.B. 692 (1999); *Crawford Door Sales Co.*, 226 N.L.R.B. 1144 (1976). Thus, to the extent the Companies seek to invoke the common-law doctrine of contract merger, we look to the contract law of New York State for guidance, as the Companies are located in New York and all relevant acts occurred there.

supersedes the old agreement.") (*quoting Ottawa Office Integration Inc. v. FTF Bus. Sys., Inc.*, 132 F. Supp. 2d 215, 219 (S.D.N.Y. 2001)).; *see also* 17A Am. Jur. 2d Contracts § 489 (emphasis added) ("*Parties to a contract* may, by their mutual agreement, accept the substitution of a new contract for the old one with the intent to extinguish the obligation of the old contract, but one party to a contract cannot, by his or her own acts, release or alter its obligations; the intention must be mutual.").

As to this issue—the identity of the entities that were party to the first LOA with the Union—the Companies and the Board differ. Newark Electric was listed on the first LOA as the "Name of Firm" that was bound by the LOA. J.A. 255. The document also bore Newark Electric's Federal Employer Identification number. James testified during the agency proceedings, however, that he thought he was signing the first LOA on behalf of Newark 2.0, a "division" of Colacino Industries. J.A. 17.[14] Davis testified in contrast that he understood the first LOA to be between the Union and Newark Electric and did not even know that a company called Newark 2.0 existed.[15] The misunderstanding was not recognized at the time.

James testified that he approached Davis about the second LOA because he had determined for accounting and administrative reasons that operating Newark 2.0 as an

---

[14] In support, James testified that he told Davis the first LOA was for Newark 2.0, and did not notice that the "2.0" symbol was missing from the document. James is listed as "CEO" on the document, but he asserts that in 2011 he was not CEO of Newark Electric; rather, he held that position for only Colacino Industries and Newark 2.0. Further supporting his position, James stated that after he purchased Newark Electric's assets from his father in 2000, that company became "dormant" and, between 2000 and 2012, it did not conduct any business. J.A. 15.

[15] Davis testified that the business card James gave him then identified James, and not Richard, as the President and CEO of Newark Electric. Further, the documents incorporating Newark 2.0 were not filed until March 8, 2011, almost two weeks after James signed the first LOA, so Newark 2.0 technically did not exist when James executed the document.

entity separate from Colacino Industries was impracticable. It made better sense to him, he said, to agree on behalf of the whole of Colacino Industries—rather than just a division, in James's mind—to a second Letter of Assent so that the entire enterprise (i.e., both Colacino Industries and Newark 2.0) was covered by an agreement with the Union. James testified that he intended the second LOA to supersede the first, or that the first would be re-dated to sometime after the date of the second LOA, so that both LOAs would have the same 180-day trial period.

Davis testified, in contrast, that in his conversation with James about the second LOA, he understood James to be referring to Newark Electric and Colacino Industries as two separate companies. This led Davis to check with the Union about whether the Union permitted a single owner to have separate LOAs for two distinct companies. Davis denied telling James that the second LOA would supersede the first or agreeing to re-date the first LOA so that it would in effect mirror the second. James did not receive a re-dated version of the first LOA.

On their respective faces, the first and second LOAs were not executed by the same parties: the first was between Newark Electric and the Union and the second was between Colacino Industries and the Union. *See* J.A. 255 (agreement between "Newark Electric" and the Union, bearing Federal Employer Identification number 16-1127802, assigned to Newark Electric); *id.* 273 (agreement between "Colacino Industries" and the Union, bearing Federal Employer Identification number 16-1586364, assigned to Colacino Industries). Now that the Board has determined, years later, that Colacino Industries is Newark Electric's alter ego for purpose of its NLRA obligations, the Companies are arguing that Colacino Industries canceled Newark Electric's obligations in the first LOA through its repudiation of the second LOA.

As detailed above, the alter ego theory prevents employers from evading labor obligations by restructuring their operations or by creating parallel entities. The

22

Companies have not cited authority for their proposition that the doctrine will apply to *relieve* one entity of its obligations based on the actions of its alter ego.[16] Indeed, although the notion advanced has some superficial appeal, we conclude that it would be misguided to apply the merger doctrine to two contracts signed by facially distinct parties, relieving one of its voluntarily undertaken obligations, premised on an administrative agency's post hoc application of a doctrine intended to further Congressionally endorsed aims to the contrary. To allow an employer to seize on such a post hoc finding and transform it into a shield that allows it to avoid its labor law obligations would conflict with the purposes of both the alter ego and the merger doctrines.

Moreover, the ALJ determined there was no actual agreement to re-date or otherwise revise the first LOA. James also testified that he thought the first LOA was re-dated to reflect the fact that the second LOA was in effect amending the first to cover the entire enterprise, i.e., both Colacino Industries and Newark 2.0. Davis testified for the Union that he understood that he was signing up a second, distinct company, and pointed out that the first LOA was not re-dated or amended in light of the second. *See* J.A. 18 ("Contrary to [James's] testimony, Davis testified that the letter of assent for Respondent Newark Electric was still in effect since he had already been informed by the IBEW that there were no problems with a single owner having two different letters for two different companies."). The ALJ labeled as "not worthy of belief" James's testimony about the re-dating of the first LOA. J.A. 22. In light of the additional

---

[16] The Companies cite *Doctor's Associates, Inc. v. Distajo*, 66 F.3d 438, 453 (2d Cir. 1995), for the broad principle that "the consequence of applying the alter ego doctrine is that . . . the acts of one are the acts of all." Respondents' Reply Br. 7. Despite the suggestive language, *Doctor's Associates* and the cases it cites all concern obligations imposed on an alter ego—not acts taken to relieve an entity from duties like the cancellation of a contract. We are aware of no case holding that an alter ego's acts relieved the related entity of an obligation.

evidence that Davis lacked authority to dissolve the first LOA, that James never received a copy of the purportedly re-dated first LOA, and the absence of notes memorializing a conversation in which any such arrangement was made, the ALJ rejected the narrative advanced by the Companies. J.A. 22.

In sum, substantial evidence supports the Board's conclusions that the Companies are a single employer and alter egos of each other and that Davis and James did not orally agree to re-date or repudiate the first LOA. Further, as a matter of New York contract law, the second LOA did not supersede the first; the first LOA was not timely canceled; it remained binding on Newark Electric until May 2015. We therefore affirm the decision of the Board that the Companies violated the Act by repudiating the terms of the first LOA and failing to abide by the MCBA.

C.      The Companies violated section 8(a)(3) by terminating Blondell's employment

Section 8(a)(3) of the Act makes it an unfair labor practice, "by discrimination in regard to hire or tenure of employment or any term or condition of employment[,] to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). If an employee's protected labor organization-related conduct is a "substantial or motivating factor prompting [a] discharge," then the discharge violates section 8(a)(3). *G & T Terminal Packaging Co.*, 246 F.3d at 115.

In its *Wright Line* decision, the Board long ago established a two-step test for ascertaining whether an adverse employment action was taken because of union activity such that the action would violate section 8(a)(3). *Wright Line, a Div. of Wright Line, Inc.*, 251 N.L.R.B. 1083, 1087 (1980). Under the *Wright Line* test, the Board must first "present evidence that proves that protected conduct was a motivating factor in the discharge." *G & T Terminal Packaging Co.*, 246 F.3d at 116. If the Board meets its burden, the employer then has an opportunity to demonstrate "by a preponderance of the

24

evidence that it would have reached the same decision absent the protected conduct," and thereby defend against liability. *Id.*

"An employer's motivation is a factual question committed in the first instance to the Board." *NLRB v. Bridgeport Ambulance Serv.*, 966 F.2d 725, 730 (2d Cir. 1992); *see also G & T Terminal Packaging Co.*, 246 F.3d at 115-16. When the Board's factual findings depend on credibility determinations made by an administrative law judge and adopted by the Board, those determinations "may not be disturbed [on review] unless incredible or flatly contradicted by undisputed documentary testimony." *NLRB v. Katz's Delicatessen of Houston St., Inc.*, 80 F.3d 755, 763 (2d Cir. 1996).

The Companies argue that the Board erred in concluding that they constructively discharged Anthony Blondell because of anti-union sentiment. In support, they highlight James's testimony that Blondell asked to be laid off so that he could keep his Union pension and "good standing" intact. Respondents' Br. 33, 35. Thus, according to the Companies, Blondell was not terminated based on his membership in the Union; rather, he left the Company of his own volition. Respondents' Br. 35. James's testimony derived general support from that of a Colacino Industries employee, Scott Barra, another Union employee who resigned his Union membership around the time Blondell was discharged. Barra testified that his decision to resign from the Union was "made between himself and his spouse," and that James did not tell him to resign from the Union. J.A. 23.

The ALJ found James's testimony in this regard not credible, commenting that it was "difficult . . . to reasonably believe" that Blondell asked to be laid off when he was "in the middle of completing a project and . . . there was work available for him to perform." J.A. 23. The ALJ instead credited Blondell's testimony that James told him he would have to be laid off once James terminated the second LOA because James would

no longer be operating a union shop.[17] The ALJ therefore concluded that the Companies failed to meet their burden in the second step of *Wright Line* to show that, "regardless of Blondell's union affiliation or activities, he would have been laid-off due to a lack of work." J.A. 23-24.

The Companies' challenge to this conclusion rests solely on the ALJ's decision to credit the testimony of Blondell over that of James and Barra. *See* Respondents' Br. 34-35. But, as previewed above, to be effective this type of challenge must meet a demanding standard: "When the NLRB's findings are based on the ALJ's assessment of the credibility of witnesses," such findings "will not be overturned unless they are hopelessly incredible or they flatly contradict either the law of nature or undisputed documentary testimony." *Kinney Drugs, Inc. v. NLRB*, 74 F.3d 1419, 1427 (2d Cir. 1996). That standard is not met here. Accepting the ALJ's credibility determination, as we therefore must, we conclude that substantial evidence supports the ALJ's finding that Blondell was terminated because of anti-union animus, in violation of section 8(a)(3). We thus have no basis for declining to enforce the Board's order that the Companies offer Blondell reinstatement to his former job or a substantial equivalent, and make Blondell whole for any resulting loss of earnings and other benefits.

---

[17] Blondell testified that, contrary to James's account, the company had work for him to perform at the time, and that he believed he was discharged because Colacino Industries was "going nonunion" and, as a union member, he could no longer work for the company. J.A. 23. James, however, testified that Blondell told him, "[Y]ou're going to have to lay me off," and that Blondell was insistent that James lay him off from Colacino Industries "for lack of work." J.A. 132. The record shows that, after the second LOA was terminated, James retained two other employees on the Colacino Industries payroll. They had resigned their Union memberships.

**CONCLUSION**

For the foregoing reasons, we hereby GRANT the Board's application for enforcement of its 2018 Decision and Order.